**In re WEDTECH CORPORATION, f/k/a Welbilt Electronics Die Corp., Debtor.**

**Bankruptcy No. 86 B 12366.**

United States Bankruptcy Court, S.D. New York.

April 16, 1987.

See also, Bkrtcy., 72 B.R. 313.

Angel & Frankel, P.C. by John H. Drucker, New York City, for debtor.

Zalkin, Rodin & Goodman by Andrew D. Gottfried, New York City, for Chemical Bank.

Laura Carraher, Mount Vernon, N.Y., for City of Mount Vernon Indus. Development Agency.

### DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The debtor-in-possession in this proceeding, Wedtech Corp. ("Wedtech" or the

"Debtor"), seeks an extension of the 60–day time period, provided for in § 365(d)(4) of the Bankruptcy Code, 11 U.S.C. § 365(d)(4) (1987) (the "Code"), in which it must assume or reject two leases of non-residential real property located respectively in the Bronx, New York and Mount Vernon, New York. While the matter was *sub judice*, the Debtor and sublessor of one of the premises requested that the Court delay ruling so that they could continue settlement discussions. This opinion, therefore, concerns only the lease with respect to the premises located in Mount Vernon, New York.

In seeking such relief, the Debtor contends that the lease pertaining to those premises is not a true lease subject to the provisions of § 365 and, therefore, that it should not be required to pay rent unless this Court determines that the lease is a true lease. It principally asserts that the presence of that issue constitutes sufficient "cause" for this Court to grant an extension of the time within which the Debtor may assume or reject these leases. Essentially, it is seeking to preserve its rights under § 365, in case the leases are deemed valid and subject to the requirements of that provision. In so doing, the Debtor aims to provide itself and its other creditors with additional protection. The application has been objected to by Chemical Bank, the holder of certain industrial development bonds collateralized, *inter alia,* by an assignment of rent to the bond trustee.[1] It principally asserts that no extension may be granted because the Debtor has failed to pay rent since the petition was filed on December 15, 1986, notwithstanding the requirement of § 365(d)(3) of the Code. It secondarily asserts that no extension may be granted since the 60–day period has passed.

## I.

Pursuant to an order to show cause signed on January 23, 1987, Wedtech brought on its motion for an extension of its time to assume or reject, *inter alia,* a lease of land and a building located at One Bradford Road, Mount Vernon, New York (the "Lease" and the "Mount Vernon Premises"). Originally, Wedtech purchased the Mount Vernon Premises for $1,250,000 in January 1984. The facility is apparently used for research and development of a highly sophisticated coatings process and for manufacturing products utilizing this process.

In order to finance the development and renovation of the Mount Vernon Premises, Wedtech apparently entered into various transactions with the City of Mount Vernon Industrial Development Agency (the "IDA") and Chemical Bank. Pursuant to an Indenture of Mortgage and Trust (the "Indenture") and a Bond Purchase Agreement, the IDA issued industrial revenue bonds in the aggregate principal amount of $5 million and sold them to Chemical Bank. The IDA used the bond proceeds to purchase Wedtech's fee interest in the Mount Vernon Premises and "leased" the Mount Vernon Premises back to Wedtech. Wedtech concomitantly guaranteed payment of the bonds. As security for payment of the Bonds, the IDA granted substantially all of its rights in the Lease to J. Henry Schroder Bank and Trust Company ("Schroder"), the trustee under the Indenture. It is apparently conceded that the Lease, the Indenture and the deed from Wedtech to the IDA were timely recorded.

Pursuant to these various agreements, Wedtech is required to make "rental" payments, currently in excess of $50,000 per month, directly to Schroder. The payments are utilized to pay interest and principal on the bonds. Total payments will equal the principal and interest due under the Indenture between the IDA and Schroder. Wedtech records them as principal and interest and not as rent. On November 1, 1934,

---

**1.** The Debtor asserts that Chemical Bank lacks standing to object to its application for an order increasing its time to assume or reject this lease of nonresidential real property (Debtors Memorandum of Law, 2/17/87, at 8–10). We need not, however, address this issue because the IDA adopted a resolution stating that it joins in Chemical Bank's objections and because counsel for the IDA so informed the Court at the hearing. City of Mount Vernon Industrial Development Agency, Resolution No. 87–5 (adopted Feb. 9, 1987).

upon paying principal and interest in full, the Debtor may purchase the Mount Vernon Premises for the sum of $1. The Debtor argues that the $1 option price, together with other specific provisions, indicates that the parties intended to create a secured transaction rather than a true lease. *See, e.g., Liona Corp., N.V. v. PCH Associates (In re PCH Associates),* 804 F.2d 193 (2d Cir.1986).

The Debtor filed a voluntary petition for reorganization under Chapter 11 of the Code on December 15, 1986. The commencement of the bankruptcy case constituted an order for relief. 11 U.S.C. § 301. The order to show cause seeking the extension was signed on the 39th day and scheduled a hearing for February 10, 1987, the 57th day. The matter was adjourned to March 2, 1987 when argument was heard.

The Debtor has come to this Court in highly unusual circumstances. Its pre-petition relationships with numerous public officials are the subject of grand jury investigations. By January 13, 1987, its primary pre-petition officers and directors had resigned and new management was installed. The Debtor has commenced adversary proceedings against four of its former officers for waste, breach of fiduciary duty, an accounting, conversion and a constructive trust. These four persons have pleaded guilty to conspiracy to transfer unlawfully benefits to federal, New York State and New York City officials, in order to cause them to exercise their official duties in an improper manner. The plea allocutions indicate that these partners misappropriated millions of dollars of the Debtor's assets.

## II.

Section 365 of the Code permits a trustee or debtor-in-possession "to reject or assume executory contracts and leases, based on a determination of whether they burden or benefit the bankrupt estate." *PCH Associates,* 804 F.2d at 200. Because "executory contracts and leases that benefit the bankruptcy [estate] are favored over contracts with other creditors", § 365 should only be applied to executory contracts and true leases. *Ibid.* Were § 365(d)(3) and (4) ap-

plied to leases intended as security and other financing arrangements, the "lessor" would gain "a distinct advantage at the expense of other creditors without a concomitant benefit to the bankruptcy estate." *Ibid.* Subsections (d)(3) and (4) of § 365, therefore, do not apply to the Lease if it is not a true lease. The Debtor, however, seeks an extension of its time to assume or reject in order to protect itself and its other creditors in case § 365(d)(4) is deemed applicable. At issue here is whether the Debtor is entitled to such an extension.

Section 365(d)(4) provides, in pertinent part:

> if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4). It is fairly established that, in order to assume a lease of nonresidential real property, the trustee need only make "up his mind to do so and [communicate] his decision in an appropriate manner" within the 60–day period. *By-Rite Distributing, Inc. v. Brierley (In re By-Rite Distributing, Inc.),* 55 B.R. 740, 742, 14 C.B.C.2d 460, Bankr.L.Rep. (CCH) ¶ 70,971 (D.Utah 1985); *Victoria Station Inc. v. Turgeon (In re Victoria Station Inc.),* 69 B.R. 110, 111 (Bankr. 9th Cir. 1986); *In re Diamond Head Emporium, Inc.,* 69 B.R. 487, 493 (Bankr.D.Hawaii 1987) (overruling *In re House of Emeralds, Inc.,* 57 B.R. 31, 35, 14 C.B.C.2d 52, (Bankr. D.Hawaii 1985)); *In re Re-Trac Corp.,* 59 B.R. 251, 254–55, 14 B.C.D. 339, 14 C.B. C.2d 782, Bankr.L.Rep. (CCH) ¶ 71,095 (Bankr.D.Minn.1986); *In re Bon Ton Restaurant and Pastry Shop, Inc.,* 52 B.R. 850, 854–55, 13 B.C.D. 628, 13 C.B.C.2d 592, Bankr.L.Rep. (CCH) ¶ 70,746 (Bankr.N.D. Ill.1985); *see In re Bygaph, Inc.,* 56 B.R. 596, 601 n. 3 (Bankr.S.D.N.Y.1986). Here, we are concerned with the parallel question of whether the court must approve a trust-

ee's or a debtor-in-possession's request for an extension of time to assume or reject an unexpired lease of nonresidential real property before the expiration of the 60–day period provided in § 365(d)(4).

There is a split among the courts on this issue. Some courts have ruled that a court order extending the time to assume must be entered within the 60–day period. *See Southwest Aircraft Services, Inc. v. City of Long Beach (In re Southwest Aircraft Services, Inc.)*, 66 B.R. 121, 123, 15 B.C.D. 453, 15 C.B.C.2d 1285, 1287, Bankr.L.Rep. (CCH) ¶ 71,509 (Bankr. 9th Cir.1986) [2]; *In re House of Deals of Broward, Inc.*, 67 B.R. 23, 24–25, 15 B.C.D. 203 (Bankr.E.D. N.Y.1986); *In re Coastal Industries, Inc.*, 58 B.R. 48, 49–50, 14 B.C.D. 397 (Bankr.D. N.J.1986); *In re Taynton Freight System, Inc.*, 55 B.R. 668, 671, Bankr.L.Rep. (CCH) ¶ 70,906 (Bankr.M.D.Pa.1985). Other courts have ruled that so long as the debtor has, within the 60–day period, made a motion seeking such an extension, the court may, if cause is found, grant the motion after the 60–day period. *See In re Musikahn Corp.*, 57 B.R. 938, 941–42 (Bankr.E.D.N.Y.1986); *In re Unit Portions of Delaware, Inc.*, 53 B.R. 83, 13 B.C.D. 635, 13 C.B.C.2d 706, Bankr.L.Rep. (CCH) ¶ 70,785 (Bankr.E.D.N.Y.1985). In our judgment, the latter cases are far more persuasive.

■ While statutory analysis necessarily begins with examination of the words employed by Congress, *see, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), we, unlike the majority of the courts noted above, do not read them " 'with the ease of a computer.' " *Kelly v. Robinson*, — U.S. —, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986) (quoting *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966)). Thus, where the wording of a

statute results in "excessive rigidity", 2 *Collier on Bankruptcy* ¶ 365.03, at 365–31 (15th ed. 1987), and such wording appears to have resulted "from a drafting oversight", as § 365(d)(4) has been so characterized, *see id.*, a court is to apply the statute in a manner calculated to achieve the purpose the words were intended to obtain. "There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it." *Federal Deposit Ins. Corp. v. Tremaine*, 133 F.2d 827, 830 (2d Cir.1943) (L. Hand, J.); *accord Unit Portions*, 53 B.R. at 84 ("it has long been recognized that a court has a duty to look beyond the language where a literal reading would produce absurd, unintended, or manifestly unjust results").

■ Briefly put, the issue here is simply whether Congress had, in Judge Learned Hand's words, an underlying purpose inconsistent with the literal wording of that phrase in § 365(d)(4) indicating that the extension must be ordered before the end of the 60–day period. Upon analysis of the 1984 restructuring of § 365 of the Code accomplished by Pub.L. No. 98–353, review of the legislative history, examination of the task Congress assigned to the bankruptcy courts in § 365(d)(4) and identification of the results that would flow from its literal interpretation, we hold that an order granting an extension need not be entered within the period so long as the motion was timely made. To hold to the contrary would be to undermine the principal purpose Congress sought to achieve in enacting § 365(d)(4).

Prior to the 1984 amendments, unexpired commercial leases were treated similar to

---

**2.** While the Bankruptcy Appellate Panel for the Ninth Circuit indicated, in *Southwest Aircraft Services*, that § 365(d)(4) "is precise and leaves no room for arguing that an extension may be granted or confirmed after 60 days have elapsed", 66 B.R. at 123, 15 C.B.C.2d at 1287, it included the following language which indicates that the rule it announced may not be as absolute as it first appears:

> We do not deal here with emergencies preventing a timely made motion from being heard within the 60 day period. The debtor's motion was not filed until the 57th day. In addition, there were no unusual circumstances giving rise to claims of excuse or waiver here.

66 B.R. at 123, 15 C.B.C.2d at 1287. Here, the motion was brought well before the 60th day.

all other executory contracts and unexpired leases. In a Chapter 11 case, a trustee or debtor-in-possession could assume or reject all executory contracts and unexpired leases at any time before confirmation of a plan of reorganization unless the court, on request of any party to the contract or lease, ordered that the determination be made sooner. 11 U.S.C. § 365(d)(2) (1978); *see Theatre Holding Corp. v. Mauro*, 681 F.2d 102 (2d Cir.1982). If the lease were rejected, the landlord received an administrative claim for the reasonable value of the trustee's use and occupancy of the premises, an amount that was often but not necessarily the rent set forth in the lease.

In 1984, Congress, concerned with the uncertainty of the rental provision and the unfairness of placing the burden of persuasion on landlords, addressed these issues. First, it added § 365(d)(3) to confirm that the trustee's obligation is to pay rent as set forth in a commercial lease. Second, it carved out commercial leases from the provisions of 11 U.S.C. § 365(d)(2) and added § 365(d)(4). It thereby placed the burden on debtors-in-possession to show cause why the time to determine whether to assume or reject should be extended. Pursuant to § 365(d)(4), only upon the court finding cause can an extension be granted.

Congress obviously did not intend the cause requirement to be lightly dismissed or blindly applied. Examination of the legislative history reveals that the requirement of cause was Congress' focus. *See, e.g.*, 130 Cong.Rec. S8891, S8894–95 (daily ed. June 29, 1984) (statement of Sen. Hatch), *reprinted in* 1984 *U.S.Code Cong. & Ad.News* 590, 598–601. As in this case, evidentiary hearings are scheduled and judges are expected to sift the evidence, examine applicable precedent and make informed rulings. At bottom, the courts, as they did under the former Bankruptcy Act in considering the tension between debtors-in-possession and landlords, are to "consider not only the interest of the landlord but also those of the debtor and its creditors", *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202, 207 (2d Cir.1974), except that the burden has now been placed on the debtor-in-possession.

In carrying out that judicial function, "no possible statutory purpose is served by terminating [an] estate's interest in [a] lease merely because the court could not hear or decide the issue within the 60–day period." *Unit Portions*, 53 B.R. at 85. Particularly is that so where a bankruptcy court, like this court, is faced with a voluminous calendar which requires a judge to hear, in addition to conducting trials and pretrial conferences, numerous motions, *see In re Bygaph, Inc.*, 56 B.R. 596, 601 n. 3 (Bankr. S.D.N.Y.1986). Many of these are of an emergency nature or concern requests for preliminary injunctions which have priority pursuant to Rule 7065 of the Rules of Bankruptcy Procedure. Furthermore, a literal application of § 365(d)(4) could lead to the absurd result of causing an "estate to forfeit a potentially critical asset merely because the trustee's motion was not decided until after the expiration of the 60 day period." *Unit Portions*, 53 B.R. at 85. Written opinions in complex matters are desirable not only for the parties but also for the appellate courts in case an appeal is taken. Not every motion is decided from the bench. There is no indication that Congress, particularly in a case such as this, intended that judges not perform fully, ably and after appropriate consideration. The legislative history either parrots the statute in this respect or fails to mention the phrase at all. *See, e.g.*, 130 Cong.Rec. S8891, S8894–95 (daily ed. June 29, 1984) (statement of Sen. Hatch), *reprinted in* 1984 *U.S.Code Cong. & Ad.News* 590, 598–601; 128 Cong.Rec. S13,227–30 (daily ed. Oct. 1, 1982) (statement of Sen. Hatch); 128 Cong.Rec. S3791–92 (daily ed. Apr. 21, 1982) (statement of Sen. DeConcini); 128 Cong.Rec. S2924–25 (daily ed. Mar. 29, 1982) (statement of Sen. Hatch). It thus conveys not the slightest desire that judges are not to evaluate the debtor's showing to determine if cause truly exists. By enacting the requirement that the court find cause, Congress must have intended that judges perform precisely in this manner. *Cf. In re Curio Shoppes, Inc.*, 55 B.R. 148, 153, 13 C.B.C.2d 1012 (Bankr.D.Conn.1985).

Secondly, the consequences that would flow from a literal reading of the provision would conflict with the overall congressional purpose that such relief be sought only where there is cause. As the district court stated in *By-Rite*, 55 B.R. at 745, the requirement of a court order prior to the end of the 60–day period would likely cause debtors-in-possession and trustees to "routinely file for extensions of the sixty-day period." Bankruptcy Judge Parente of the Eastern District of New York similarly observed that "if the debtor-in-possession required court approval of its motion for extension within the 60 day period, it would need to initiate such a motion soon after the Chapter 11 filing, before it had any opportunity to exercise proper business judgment to assess the value of the lease to the estate." *Musikahn*, 57 B.R. at 941–42.

Such an emphasis on immediately filing for an extension, in an effort to obtain a court order within 60 days of the order for relief, could also have the highly undesirable affect of disabling attorneys from making the reasonable inquiry required by Rule 9011 of the Rules of Bankruptcy Procedure (1983) before filing such motions and thereby subject them to sanctions.

In complex cases, moreover, requiring a trustee or debtor-in-possession to obtain a court-ordered extension within the 60–day period "would unduly tax the trustee [or debtor-in-possession], who must also calculate assets and debts, determine creditors and file schedules soon after the filing of the petition." *By-Rite*, 55 B.R. at 745.

All this would defeat the statutory purpose that there be a reasoned finding of cause before granting an extension. As noted by a principal commentary, courts would likely respond to the deluge of motions for extension by granting many of them, due to "the exigencies of a large chapter 11 case and the emphasis on rehabilitation rather than liquidation", 2 *Collier on Bankruptcy* ¶ 365.03, at 365–31 (15th ed. 1987), without the benefit of careful factual development and the time necessary to tailor the extension to fit the facts of the particular case. In many cases,

courts would be likely to grant substantial extensions of time "since no further extension [would] be available outside of the 60–day period...." *Ibid.* The routine filing of motions for extension of time, moreover, could easily lead "to the very evil that § 365(d)(4) was meant to cure—costly delay." *By-Rite*, 55 B.R. at 745.

Compounding that delay would be the further delay that would occur were the words referring to a court order within the 60–day period to be literally followed and thus further extensions prohibited. As *Collier's* observes, the court, in order to comply, could "grant an open-ended extension within the sixty-day period and ... provide in the order that the lease will be terminated as to a specific party in interest upon a showing of cause." 2 *Collier on Bankruptcy*, ¶ 365.03, at 365–31 (15th ed. 1987). Such orders would, however, defeat the whole purpose of § 365(d)(4) and effectively reinstate § 365(d)(2) before the amendment. *In re Telemark Management Co., Inc.*, 51 B.R. 623, 625–26 (Bankr. W.D.Wis.1984). *Collier's* also suggests that a sensible interpretation of the statute in this regard would be to reason "that additional extensions could be sought outside the sixty-day period coupled with a provision in the extension order providing that it will be subject to reconsideration or modification upon an appropriate showing of cause." 2 *Collier on Bankruptcy*, ¶ 365.03, at 365–31 (footnote omitted). The inconsistency of the clause with the overall purpose of § 365(d)(4) is thus recognized and courts are urged, in a manner consistent with the interpretive canon articulated by Judge Learned Hand in *Federal Deposit Ins. Co. v. Tremaine*, to honor the purpose rather than act with over solicitude for the literal terms.

There is no question that statutes are to be enforced. But in carrying out that task, courts are to act in accordance with the congressional purpose rather than defeat it through over-literalism. We thus hold that, so long as the motion for extension was brought within a reasonable time before the end of the period, courts, after performing their function and upon finding

cause, may, after the 60th day, order an extension.

■ Furthermore, there are additional reasons for finding that the lease for the Mount Vernon Premises is not to be deemed rejected pursuant to § 365(d)(4). The Debtor sought to extend its time to assume both leases 42 days after filing its petition. The hearing was set for February 10, 1987, a date within the 60–day period, and it was subsequently adjourned on consent of the parties to a date outside the 60–day period (Tr. 2/10/87 at 47–48). "[B]y setting the matter down for further hearing ... the court ... necessarily and impliedly extended the time to assume for such additional period as necessary for resolution of the disputed factual and legal issues...." *In re Bon Ton Restaurant and Pastry Shop, Inc.,* 52 B.R. 850, 854, 13 B.C.D. 628, 13 C.B.C.2d 592, Bankr.L.Rep. (CCH) ¶ 70,746 (Bankr.N.D.Ill.1985). Moreover, by agreeing to adjourn the matter to a date outside the 60–day period, Chemical Bank must be deemed to have waived its right, if any, to consider the lease rejected pursuant to § 365(d)(4). *See id.* at 855. For these reasons, as the *Bon Ton* court holds, the unexpired lease was not deemed rejected pursuant to § 365(d)(4) and no further order need have been entered.

### III.

Accordingly, we now turn to the issue of whether cause exists for extending the Debtor's time to assume or reject the Lease.

■ With respect to leases pertaining to premises of material significance to bankruptcy estates, there have been numerous cases in this Circuit. Principal among them is *Theatre Holding Corp. v. Mauro,* 681 F.2d 102 (2d Cir.1982). There, the Second Circuit indicated that a bankruptcy court should not generally shorten the time to assume or reject a lease of a principal asset of the debtor-in-possession to less than 120 days after the filing of the bankruptcy petition. *Id.* at 106. Although that holding has been legislatively overturned

with respect to nonresidential leases of real property by the passage of subsections (d)(3) and (d)(4) of § 365 of the Code, *see In re Beker Industries Corp.,* 64 B.R. 890, 898 n. 5 (Bankr.S.D.N.Y.1986); *Daugherty v. Kenerco Leasing, Inc. (In re Swanton Corp.),* 58 B.R. 474, 475, 14 B.C.D. 273 (Bankr.S.D.N.Y.1986), *Theatre Holding* "remains good law in this Circuit as to other executory contracts", *Beker,* 64 B.R. at 898 n. 5, and remains highly instructive on the factors which may demonstrate "cause" for extension of time to assume. *In Theatre Holding,* the Second Circuit discussed various circumstances which a court should weigh in determining whether to shorten a trustee's or debtor-in-possession's time to assume or reject an essential commercial lease under former § 365(d)(2). By switching the burden of proof to the debtor-in-possession in Chapter 11 cases through redacting commercial leases from § 365(d)(2) and adding § 365(d)(4) in 1984, Congress must be deemed to have incorporated the *Theatre Holding* factors into the elements of "cause" under § 365(d)(4) rather than compel the courts to start anew in developing such factors. *Cf. Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 759–60, 88 L.Ed.2d 859 (1986).

*Theatre Holding* indicates that the following criteria weigh in favor of granting an extension of time: (i) the lease is a primary asset and the "decision to assume or reject the lease would be central to any plan of reorganization" in the Chapter 11 proceeding, 681 F.2d at 106; (ii) the landlord has a reversionary interest in a building built by the tenant on the landlord's land and the gaining of the building would represent a windfall to the landlord, 681 F.2d at 105 n. 3; (iii) the debtor has not had the time necessary to intelligently " '... appraise its financial situation and the potential value of its assets in terms of the formulation of a plan ...' ", 681 F.2d at 106 (quoting *In re Midtown Skating Corp.,* 3 B.R. 194, 197 (Bankr.S.D.N.Y. 1980) [3]; and (iv) the existence of any other

---

**3.** *See also Musikahn,* 57 B.R. at 944 (cause for  extension existed where (1) debtor required ad-

facts indicating the lack of a "reasonable time to decide whether to assume or reject", 681 F.2d at 105.

Conversely, under *Theatre Holding*, the following criteria weigh against granting an extension of time: (i) failure to pay for the use of property, 681 F.2d at 105, or, now in light of § 365(d)(3) in the cases of commercial leases, failure to pay the rent reserved in the lease [4]; (ii) damage to the lessor "beyond the compensation available under the Bankruptcy Code" through the debtor's continued occupation of the land and its failure to pay taxes, 681 F.2d at 105–06; and (iii) where the debtor fails or is unable to formulate a plan when it has had more than enough time to do so, 681 F.2d at 106. Consideration of these and other relevant factors determines whether relief should be granted and shapes the contours of such relief. *Cf. In re Beker Industries Corp.*, 64 B.R. 890, 899 (Bankr.S.D.N.Y. 1986).

To these factors, other courts and the legislative history to § 365(d)(4) have added the following factors supporting the grant of an extension of time to assume: (i) the lessor continues to receive monthly rental payments, *Bon Ton*, 52 B.R. at 855; (ii) the case is exceptionally complex and involves large numbers of leases, *In re Curio Shoppes, Inc.*, 55 B.R. 148, 154, 13 C.B. C.2d 1012 (Bankr.D.Conn.1985); 130 Cong. Rec. S8891, S8894–95 (daily ed. June 29, 1984) (statement of Sen. Hatch), *reprinted in* 1984 *U.S.Code Cong. & Ad.News* 590, 598–601; and (iii) following from the *Theatre Holding* emphasis on intelligent assessment in order to propose a reorganization plan, the need for judicial determination of whether a lease exists since the trustee or debtor-in-possession "cannot be required to commit itself to the investment which assumption of the [l]ease would require unless it knows that it has a lease", *In re Family Showtime Theatres, Inc.*, 58 B.R. 679, 684 (Bankr.E.D.N.Y.1986).

■ Consideration of these factors indicates that cause exists for the extension. The Mount Vernon Premises appear to be a principal asset to Wedtech. They are used as a research, manufacturing and testing facility in a sophisticated coatings division. As previously noted, the peculiar facts of this case have required new management and left the Debtor without sufficient time to appraise its entire financial situation and value its assets in order to commence preparation of a plan.

Most significantly, the Debtor is also uncertain of the nature of the transaction involving these premises and has commenced an adversary proceeding seeking to have the agreement with respect to these premises ruled to be a financing arrangement not subject to § 365(d)(3) and § 365(d)(4), rather than a true lease. The mere commencement of an adversary proceeding should not, in our judgment, weigh heavily in favor of granting an extension absent an examination of that proceeding. But here, such an examination reveals that the proceeding can hardly be said to be frivolous or interposed primarily for the purpose of gaining the desired extension.

In assessing whether a transaction styled as a lease is indeed a true lease, the pre-

---

ditional time to assess the profitability of a location during the "busy season"; and (2) debtor was in midst of negotiations to obtain loans which would be used to provide working capital and satisfy post-petition rent obligations).

4. In *Theatre Holding*, the Second Circuit makes it clear "that a debtor's failure to satisfy post-petition obligations is but one element of consideration in setting a reasonable time for a debtor to assume a lease constituting its principal asset in the initial period after it filed its petition." *In re Beker Industries Corp.*, 64 B.R. 890, 898 (Bankr. S.D.N.Y.1986). In *Beker*, this Court noted that even with the addition of §§ 365(d)(3), (4) in 1984, Congress has not "provided for mandatory assumption or rejection on the ground that a debtor failed to keep current." *Ibid.* The failure to make payments pursuant to § 365(d)(3) is but "an element to be considered in determining whether cause exists pursuant to § 365(d)(4) to extend the 60–day period for assumption or rejection." *Ibid; see also In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 753, 14 B.C.D. 333, 14 C.B.C.2d 909, Bankr.L.Rep. (CCH) ¶ 71,- 204 (Bankr.S.D.N.Y.1986). "But, as *Theatre Holding* also indicates, the court in drawing a balance is to give greater weight to a debtor's failure to perform post-petition obligations over a longer period of time in which it could decide what to do with the asset. 581 F.2d at 106." *Beker*, 64 B.R. at 898.

sumption that an agreement is what it purports to be gives way to an ultimate determination based on "the economic substance of the transaction and not its form." *Liona Corp., N.V. v. PCH Associates (In re PCH Associates)*, 804 F.2d 193, 200 (2d Cir.1986); *see also 48th Street Steakhouse, Inc. v. Rockefeller Center, Inc. (In re 48th Street Steakhouse, Inc.)*, 61 B.R. 182, 190 (Bankr.S.D.N.Y.1986), *aff'd*, No. 86 Civ. 5313, slip op. (S.D.N.Y. March 19, 1987) [Available on WESTLAW, DCT database]; *In re Winston Mills, Inc.*, 6 B.R. 587, 596–97, 2 C.B.C.2d 1267 (Bankr.S.D.N.Y.1980). In *PCH Associates*, the Second Circuit ruled that the following circumstances indicate that an agreement is not a true lease: (i) payments were not calculated to compensate for use but rather to ensure a return on investment, (ii) the "purchase price" was calculated as an "amount necessary to finance the transaction", (iii) the property was " 'purchased by the lessor specifically for the lessee's use' ", (iv) the lessee originally sought a loan but, to secure tax advantages, the transaction was subsequently structured as a lease, (v) "the purchase price was not related to the value of the land", and (vi) the "lessee assumed many of the obligations associated with outright ownership of the property", i.e., property taxes and insurance. *Id.* at 200–01. This list, of course, is not exhaustive. Other circumstances which indicate that an agreement is not a true lease include: (i) an option price bearing little resemblance to fair market value, (ii) an option price that is minimal in comparison with total payments, and (iii) rental payments equal to or greater than the selling price. *See NYNEX BISC v. Beker Industries Corp. (In re Beker Industries Corp.)*, 69 B.R. 937, 940 (Bankr.S.D.N.Y.1987).

Review of the documents filed in connection with the complaint substantiates the Debtor's assertion that its complaint is hardly without merit. For example, the transaction involves a purchase of the premises by the lessor from the lessee for the lessee's use. The Debtor has the option to pre-pay the amounts due under the Lease Agreement and purchase the premises for the nominal sum of one dollar (Lease Agreement § 8.1). The nominal option price indicates "that the parties are looking to the stream of 'rental payments' as the principal form of compensation." *NYNEX BISC v. Beker Industries Corp.*, 69 B.R. at 941. Section 3.3(2) of the Lease Agreement places the obligations of ownership of the property on the lessee. Section 4.3 requires the lessee to pay "all taxes and governmental charges of any kind whatsoever ... with respect to the Project ..." (Lease Agreement § 4.3). Moreover, § 7.01(2) of the Indenture provides for acceleration of payment of the outstanding principal and the interest accrued thereon upon default of the Lease Agreement. Lastly, § 3.4 of the Lease Agreement makes the lessee's obligations unconditional regardless of *any* cause including, *inter alia*, facts constituting an eviction or constructive eviction and indicates that payments are not intended to compensate for use but rather to ensure a return on investment.

In rebutting these notions and relying on *Martin Bros. Toolmakers, Inc. v. Industrial Development Board of City of Huntsville (In re Martin Bros. Toolmakers, Inc.)*, 796 F.2d 1435 (11th Cir.1986), Chemical Bank asserts that, as a matter of law, the transaction can be characterized only as a lease. In *Martin Bros.*, the debtor entered into a lease with an Alabama city industrial development board for occupancy of a building built to its specifications. Construction was financed by the issuance of industrial development bonds, the payment of which was to be made by rental payments and was secured by a mortgage on the facility and an assignment of the board's rights under the lease. Upon payment of the bonds, the debtor could renew the lease or, for $5,000, purchase the property. In holding the arrangement to be a lease, the Eleventh Circuit gave two principal reasons. First, citing cases that follow the reasoning of *In re Booth*, 19 B.R. 53 (Bankr.D.Utah 1982), the Court stated that the "determination in bankruptcy ... of whether a particular agreement is in fact a lease or a security agreement for purposes of § 365 often depends on which characterization will best

serve the interests of the estate," 796 F.2d at 1439, and observed that to apply that test would be particularly inappropriate because such principles are developed in the context of only two competing interests, and in this case we have, [in the industrial development board] a third, public interest." 796 F.2d at 1440. That public interest, according to the court, lay in the Alabama law prohibition of an industrial development board from assuming "the forbidden status of mortgagee and the state tax exemption would be lost." *Ibid.* Secondly, the court reasoned that the doctrine of equitable estoppel barred the debtor from arguing that the transaction was a lease. 796 F.2d at 1441.

At this stage in the dispute between Chemical Bank and the Debtor, however, it is not at all clear that *Martin Bros.* will operate to bar the Debtor's claim. In responding to questioning by the Court as to whether the dispute can be expedited, Chemical Bank claimed that it required extensive discovery. That being so, it would seem, unless clarified by the discovery process, that there are disputed issues of fact which must be resolved even under *Martin Bros.* Secondly, and aside from the issue of whatever impact New York law might have, it is not at all apparent that the approach of the *Martin Bros.* court is followed in this Circuit. The notion that a transaction that is in substance either a lease or mortgage should be characterized differently because the debtor has filed for bankruptcy was not the approach taken by the Second Circuit in *PCH Associates.* That notion would add great instability to commercial transactions and lead to inconsistent interpretation.[5] The proper focus centers on the objective intent of the parties and the circumstances of the transaction. *PCH Associates*, 804 F.2d at 198; *cf. NYNEX BISC v. Beker Industries Corp.*, 69 B.R. at 939. Such an approach, moreover, in the directly related area of defining contracts as executory and therefore rejectable, is contrary to the material breach test

as articulated by Professor Countryman, Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn.L.Rev. 439, 460 (1973), which Congress intended to be applied under § 365. *See* 2 *Collier on Bankruptcy* ¶ 365.02, at 365–13 (15th ed. 1987); H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303.

It is to be stressed that no final determination of the issue is made on this motion. There may be other considerations that will bear on the issue. All we hold is that in this case, involving new management picking up the pieces of a debtor in disarray, cause has been shown for the extension of time to assume or reject a lease pertaining to a material asset, where the Debtor has asserted a serious claim that the Lease is a security interest, so that the matter can be determined in the course of the extant adversary proceeding. Absent such a determination, it is not clear that § 365(d)(4) even applies to the matter. That rent has not been paid is addressed below in formulating conditions for the extension.

## IV.

■ Notwithstanding the existence of cause for the extension sought here, Chemical Bank asserts that this Court may not grant an extension of the Debtor's time to assume or reject under § 365(d)(4), despite the existence of cause, if the Debtor has failed to make post-petition rent payments within 60 days after the order for relief, as required by § 365(d)(3). Section 365(d)(3) provides:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for perform-

---

5. For example, the issue of whether a lease of personal property is actually a security agreement arises under § 1–201(37) of the Uniform Commercial Code. *See NYNEX BISC v. Beker*

*Industries Corp.*, 69 B.R. at 939–40. The hypothesis that such issues are to be determined differently merely because the debtor/lessee filed a bankruptcy petition is highly questionable.

ance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

11 U.S.C. § 365(d)(3).

While it is clear that a court may not authorize a debtor to delay its compliance with § 365(d)(3) beyond the 60–day period, the statute does not indicate the consequences of the debtor's failure to perform. *See In re Beker Industries Corp.*, 64 B.R. 890, 898 (Bankr.S.D.N.Y.1986); *In re Compass Van & Storage Corp.*, 61 B.R. 230, 233 (Bankr.E.D.N.Y.1986); *In re Tandem Group, Inc.*, 60 B.R. 125, 127 (Bankr.C.D. Cal.1986); *In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 752, 14 B.C.D. 333, 14 C.B.C.2d 909, Bankr.L.Rep. (CCH) ¶ 71,204 (Bankr.S.D.N.Y.1986); *In re Condominium Administrative Services, Inc.*, 55 B.R. 792, 799 (Bankr.M.D.Fla.1985); 2 *Collier on Bankruptcy* ¶ 365.03, 365–31 (15th ed. 1987). The wording of the statute indicates that a failure to make payments within the 60–day period may constitute a default but it does not indicate that such default cannot ultimately be cured under § 365(b). *See Westview 74th Street Drug Corp.*, 59 B.R. at 753 ("the existence of such defaults should not effect an automatic termination of the leasehold interest"). *But cf. Tandem Group*, 60 B.R. at 127; *In re Southwest Aircraft Services, Inc.*, 53 B.R. 805, 808, 13 B.C.D. 814, 13 C.B.C.2d 979, Bankr.L.Rep. (CCH) ¶ 70,833 (Bankr.C. D.Cal.1985) (dicta). As Judge Brozman of this Court has reasoned:

> That § 365(d)(3) contains no such forfeiture provision is beyond dispute. Certainly, Congress knew how to achieve a forfeiture had it intended one, for § 365(d)(4) deems a lease rejected upon failure to assume or reject it within 60 days or such extended period as the court fixes and directs the trustee to *immediately surrender* the leased non-residential property to the lessor, without the necessity of any eviction proceedings under state law. But equally beyond dispute is the failure of § 365(d)(3) to prescribe any result for violation of its mandate.... It is the determination of what type of relief is appropriate with which this court must grapple.

*Westview 74th Street Drug Corp.*, 59 B.R. at 752 (citation omitted).

Thus, there is no absolute remedy for violation of § 365(d)(3) which must be applied in every case. Nor can it be said that Congress prohibited extensions under § 365(d)(4), where there is cause, because of the debtor's failure to pay rent. Rather, Congress, by choosing not to articulate such a remedy, has left it to the courts to fashion an appropriate remedy for violation of § 365(d)(3) based on the particular facts of each case. In some cases, a court may order the debtor to pay the rent that became due and owing after the filing of its petition within a certain time period. *E.g.*, *In re T.F.P. Resources, Inc.*, 56 B.R. 112, 117, 13 B.C.D. 1104, 13 C.B.C.2d 1345, Bankr.L.Rep. (CCH) ¶ 70,946 (Bankr.S.D.N. Y.1985). In cases where cause is minimal, the Court might well refuse the debtor the additional time it desires. In cases where cause is stronger, a court might terminate "any extension of the time within which to assume or reject under § 365(d)(4) ..." based on the failure to pay rent accruing during the extension. *See 2 Collier on Bankruptcy* ¶ 365.03[2], at 365–31 (15th ed. 1987). "A debtor's failure to keep current on its post-petition obligations to its landlord is a factor which should weigh heavily in favor of limiting the debtor's right to maintain the lease in limbo...." *Westview*, 59 B.R. at 753.

These precepts are applicable here. The significance of the premises and the need for examination of whether § 365(d)(4) applies weigh heavily against forfeiture. But no reason has been offered to excuse the Debtor from paying rent during the extension it seeks, other than that it has come into bankruptcy court because of misdeeds by several former officers and directors.

Unlike that branch of the Debtor's motion involving a sublease with an entity in which a partnership consisting of five former officers and directors has a material interest, no unclean hands claims have been asserted by the Debtor with respect to the instant Lease. Indeed, the facts of this case add an additional factor requiring such payment. Were the Debtor to prevail in its claim that the lease for the Mount Vernon Premises is a security interest, it apparently will not be able to avoid that security interest given its concession that the various documents were recorded and the interest perfected. Since the Debtor apparently contends that the bond trustee is oversecured (Tr. 3/2/87 at 13–14; *but see* Tr. 2/10/86 at 47), it apparently will not be able to cram down the trustee pursuant to 11 U.S.C. § 1129(b)(2)(A) by providing only for payment of a lesser value. Thus, it appears that the Debtor will ultimately pay the amount due the trustee. That sum is equivalent to the rent called for under the Lease.

Still, in formulating appropriate conditions for the extension sought by the Debtor, we cannot be unmindful that this is a Debtor who has filed a petition in bankruptcy because of the criminality of several of its former officers and directors, unlike nearly all other debtors who have floundered in the heavy seas of commerce or suffered from having made poor business decisions. Its creditors have a stake in these motions. *See Queens Blvd. Wine & Liquor Corp.*, 503 F.2d at 206. To require the Debtor immediately to pay rent due from February 13, 1987, the 60th day since the petition was filed, without any indication that it can do so would be to foist that criminality upon them. Congress, in leaving the bankruptcy courts with discretion to apply remedies under § 365(d)(3), could not have intended such a result. A far more appropriate balance of these various concerns is to require the Debtor to amortize payments for the period from February 13, 1987 over four months.

### V.

For the foregoing reasons, it is ordered that the motion by the Debtor for additional time to assume or reject the Lease with respect to the Mount Vernon Premises is granted to the extent that such extension is limited to 20 days after the entry of a final order with respect to its complaint, as same may be amended, where it is asserted that the Lease is a security agreement, without prejudice to a motion for further extension, provided that the bond trustee be paid:

(a) the rent due under such lease after the date of this Decision and Order at the times set forth in such lease and

(b) commencing with the first payment under (a) above and concluding with the fourth such payment, one fourth of the rent for the period due from February 13, 1987 to the first day covered by the first payment due under paragraph (a) above and

further provided that such extension shall terminate upon the failure to make either payments set forth, provided that three business days before such payments are due, the Debtor receives a notice setting forth the amounts then due.

It is SO ORDERED.