**In re ERNST HOME CENTER, INC. and EDC, Inc., Debtors.**

**Bankruptcy Nos. 96–10129, 96–10135.**

United States Bankruptcy Court, W.D. Washington, at Seattle.

April 15, 1997.

---

See also 1997 WL 346140.

Timothy W. Dore, Seattle, WA,

Dillon E. Jackson, Seattle, WA,

Alan D. Smith, Seattle, WA,

MEMORANDUM DECISION ON DEBTOR'S MOTION TO EXTEND TIME TO ASSUME OR REJECT AOS AGREEMENT LEASES (Puyallup, Washington Lease)

KAREN A. OVERSTREET, Bankruptcy Judge.

This matter came before the Court on Ernst's Motion to Extend Time Within Which to Assume or Reject AOS Agreement Leases (the "Extension Motion"). The following are the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052 as the Extension Motion relates to the Puyallup Lease (as hereinafter defined).

## I. BACKGROUND

The Extension Motion was filed on March 17, 1997. It relates to an agreement (the "AOS Agreement") between Ernst Home Center, Inc. ("Ernst") and AOS Investments, LLC ("AOS") that I approved on September 25, 1996. The order approving the AOS Agreement (the "AOS Order") amended the AOS Agreement as set forth therein. The AOS Agreement provides for the sale of six of Ernst's store locations (the "Acquired Leases") to AOS and the management by AOS of an additional 18 Ernst store locations (the "Managed Leases"). The AOS Agreement contemplates that AOS will market the Acquired Leases and the Managed Leases (collectively the "AOS Leases") to third parties. Under the AOS Order, the deadline for AOS to propose sales of these leases was March 25, 1997. The AOS Order required that a motion to extend that deadline be filed on or before March 25, 1997. Therefore, the Extension Motion is timely.

Many of the AOS Leases have already been assumed, rejected or terminated. The leases at issue in the Extension Motion are the remaining leases under the AOS Agreement (the "Remaining Leases"). Pursuant to the Extension Motion, Ernst seeks to extend for 60 days the time to assume or reject the Remaining Leases. All of the landlords under the Remaining Leases, except the landlords of the Yakima and Boise locations, objected to the Extension Motion. The Remaining Leases include the following Ernst store leases and locations:

| Store Number | Store Location |
| --- | --- |
| 223 | Yakima, WA |
| 243 | Reno, NV |
| 248 | Auburn, WA |
| 249 | Aurora Plaza, Seattle, WA |
| 252 | Meridian Center Puyallup, WA |
| 260 | Green Firs Tacoma, WA |
| 262 | Boise, ID |
| 269 | Great Falls, MT |
| 288 | Everett, WA |
| 318 | Oroville, CA |

The Extension Motion was set for hearing on March 21, 1997. The prior week, the Court held a hearing on a motion by some of the landlords of the Remaining Leases to terminate the time for Ernst to assume or reject the Remaining Leases under the AOS Agreement (the "Landlords' Motion"). The Court ordered that the Landlords' Motion be consolidated with the Extension Motion and heard at the same time. The Court also set an evidentiary hearing on both motions for April 4, 1997, to give the parties additional time to submit declarations and to identify witnesses for oral testimony. The evidentiary hearing took place on April 4, 1997 and April 7, 1997. By the time of the conclusion of the hearing, Ernst and AOS had reached extension agreements or other accommodations with the landlords under each of the Remaining Leases, except for the landlord of the Puyallup, Washington location.[1]

Washington Capital Management, Inc. is the lessor of Ernst's space at the Meridian Center in Puyallup, Washington (the "Landlord"), pursuant to a Lease Agreement dated as of July 19, 1978, and as thereafter amended (the "Puyallup Lease"). Ernst, the Landlord, and AOS presented evidence in support of their respective positions.

## II. JURISDICTION

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334 and this is a

---

1. The hearing with respect to the Oroville and Reno locations was continued to April 23, 1997, at 9:30 a.m.

core proceeding under 28 U.S.C. § 157(b)(2)(M).

## III. DISCUSSION

### A. *The Standard for Extension Under Section 365(d)(4).*

■ Bankruptcy Code § 365(d)(4)[2] permits the Court to extend Ernst's time to assume or reject a lease of nonresidential real property "for cause." Although "cause" is not defined in Section 365(d)(4), courts generally look to the following factors for guidance:

1. Whether the lease is the primary asset of the debtor.
2. Whether the lessor has a reversionary interest in the building built by the debtor on the landlord's land.
3. Whether the debtor has had time to intelligently appraise its financial situation and potential value of its assets in terms of the formulation of a plan.
4. Whether the lessor continues to receive the rent required in the lease.
5. Whether the lessor will be damaged beyond the compensation available under the Bankruptcy Code due to the debtor's continued occupation.
6. Whether the case is exceptionally complex and involves a large number of leases.
7. Whether the need exists for a judicial determination of whether the lease is a disguised security interest.
8. Whether the debtor has failed or is unable to formulate a plan when it has had more than enough time to do so.
9. Any other factors bearing on whether the debtor has had a reasonable amount of time to decide to assume or reject the lease.

*See, e.g., In re Victoria Station, Inc.,* 88 B.R. 231, 236 (9th Cir.BAP1988), *aff'd,* 875 F.2d 1380 (9th Cir.1989); *In re Wedtech Corporation,* 72 B.R. 464, 471–473 (Bankr.S.D.N.Y. 1987); *Theatre Holding Corp. v. Mauro,* 681 F.2d 102 (2d Cir.1982).

The AOS Order provides that "in the event that AOS is not in default under the AOS

Agreement, or the terms of this Order, Ernst shall seek further 60–day extensions of the time to assume or reject the Acquired Leases and the Managed Leases upon proper application to the Court." Ernst has satisfied its obligations under the AOS Order as to the Puyallup Lease via the Extension Motion. There was never any guaranty given to AOS, however, in the AOS Agreement or otherwise that further extensions under Section 365(d)(4) would be granted nor was there any commitment made to AOS that a particular test would be used by the Court to determine whether there is "cause" for an extension.

AOS argues that its expectation was that the Court would analyze the above-cited factors by treating AOS as the "debtor" under Section 365(d)(4). AOS concludes that applying the test in this way mandates the requested extension because the Puyallup Lease is a major asset of AOS and the benefit to AOS of having the extension outweighs the detriment to the Landlord. That AOS may have had an *expectation* that the Court would apply a certain test does not preclude the Court from adopting a different approach.

■ In the *Victoria Station* case, the Bankruptcy Appellate Panel noted that there are "numerous and important factors" that should be considered when viewing a request for an extension of time under Section 365(d)(4), including those factors set forth above. Certainly, the list of factors was not meant to be exclusive nor should a Court be required to consider particular factors that have no application to the request for extension at issue. The test "for cause" under Section 365(d)(4) leaves a great deal of discretion to the Court to weigh all relevant factors related to a request to extend the time for assumption or rejection of leases.

The AOS transaction was a transaction of first impression for this Court, and the request for extension of time here cannot be properly analyzed just by a rigid application of the factors set forth above. Some of those factors have no application to the requested extension. Further, there are additional fac-

---

2. Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Feder- al Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

tors this Court believes-should be considered given the uniqueness of the AOS transaction.

### B. *The Evidence Presented.*

The parties presented evidence by way of declaration testimony, live testimony, and incorporation of testimony given at a hearing on Ernst's request to sell three fee interests and 59 leasehold interests (other than the AOS Leases) to FADCO, LLC (the "FADCO Transaction"). The hearing on the FADCO Transaction commenced on February 27, 1997.

In support of the Extension Motion, AOS put on evidence of its efforts to locate end-use tenants for all of the Remaining Leases, including the Puyallup Lease. The evidence showed that the process of locating suitable tenants for these lease locations has been difficult, given the complexity of dealing with tenant improvements that might be required and the use restrictions under the leases. In the case of the Puyallup Lease, the parties agree that the size of the premises defined under the lease, which is about 37,000 square feet, has inhibited the selection of suitable tenants. The space is larger than what most of the potential tenants require. Therefore, there is no dispute that some division of the space likely will have to occur in order to accommodate at least two tenants for the entire Ernst space. This makes the prospect of significant renovations to the space a virtual certainty.

Both AOS and the Landlord put on evidence of the value of the Puyallup Lease. In a declaration, Donald Gaube of AOS testifies that the "bonus value" of the Puyallup Lease, together with the leases of the Reno and Oroville leases is $3.5 million.[3] This evidence is not very probative without knowing the separate values attributable to each of the locations. Although none of the witnesses defined "bonus value", that concept appears to take into account at a minimum the spread between the current rent under the Puyallup Lease ($4.50 per square foot) and the rent that the potential tenants for the space would pay (generally described in the testimony as being between $8.00 and $15 per square

foot). Both Mr. Gaube and Michael Barnes, the portfolio manager for the Landlord, described the bonus value of the Puyallup Lease as being in the neighborhood of $4 million. Presumably, this value takes into account the cost of tenant improvements, the rent paid under the lease, the percentage rent payable under the lease, and the term of the lease. The Puyallup Lease has at least a term of 15 years remaining, with options for extensions. The evidence is clear that the bonus value of the Puyallup Lease, whatever the precise amount, is substantial.

The evidence showed that AOS and the Landlord have both been working to reach a consensual arrangement for retenanting the Puyallup space. Significant efforts were made to put together a deal with OfficeMax, Inc. and Ross Dress for Less. That deal would require significant tenant improvements and the addition of more square feet to the premises than currently covered by the Puyallup Lease. Ultimately, the negotiations broke down. At trial, each party tried to show the lack of bona fides of the other in these negotiations. Based upon the evidence, however, I conclude that both the Landlord and AOS conducted themselves in good faith in those negotiations.

The only real area of dispute between AOS and the Landlord appears to be the division between them of the so-called bonus value. Not surprisingly, the Landlord would like to preserve all of the bonus value for itself just as AOS would like to preserve all of the bonus value for itself. These positions represent the two extreme options in this case: if the Landlord obtains a termination of the time for Ernst to assume or reject the Puyallup Lease, it may then obtain all of the bonus value. If, on the other hand, the Extension Motion is granted and AOS is able to effect an assignment of the Puyallup Lease to one or more tenants pursuant to Section 365 and over the objection of the Landlord, AOS will be able to obtain 100% of the bonus value.

---

**3.** AOS has been reluctant to disclose its estimates of the actual value of each of the Remaining Leases for fear of prejudicing ongoing negotiations with the landlords of those leases and potential tenants. AOS did submit a number of letters of intent for *in camera* review by the Court.

In support of its ability to effect an assignment of the Puyallup Lease under Section 365, AOS put into evidence letters of intent that it has received from OfficeMax, Inc. and Pep Boys.[4] Under the letters of intent, these two tenants would split the current Ernst space in Puyallup, either as the tenants under the Puyallup Lease or as sublessees of AOS as the tenant under Puyallup Lease. The letters of intent support the assertion by AOS that the Puyallup Lease is of substantial value.

The terms of the Puyallup Lease appear to permit the kind of transaction AOS envisions. The Puyallup Lease requires the Landlord to give its reasonable consent to (i) uses of the premises other than as a hardware-type store (Puyallup Lease, ¶ Sixth, p. 15), (ii) sublessees of Ernst (Id., ¶ Eleventh, p. 23), and (iii) leasehold improvements (Id., ¶ Sixth, p. 15).

The Landlord put on evidence of the damages it will suffer if Ernst is granted a 60–day extension of the time to assume or reject the Puyallup Lease. The declaration of Herb Brooks, a property manager for Trammell Crow Company, the manager of the Meridian Center, states that the Ernst space in that center represents one-third of the gross leasable space in the center. He cites to general complaints expressed by a number of other tenants in the center who have allegedly suffered decreased sales as a result of the cessation of business at the Ernst store. There is no dispute that Ernst has not conducted any business at the Puyallup store since late July or early August of 1996. The Landlord also incorporated by reference the testimony of Steve Hansen and John Bennett, two witnesses at the hearing on the FADCO Transaction. Those gentlemen testified generally at the FADCO hearing about the hardships faced by shopping center owners when an anchor tenant goes dark. These hardships include a drop in overall customer traffic at the center, reduced sales for other nonanchor tenants, and the inability of the owner to sell the center or refinance any loans it has taken out in connection with the center. There is no dispute that the Meridian Center is a shopping center within the

meaning of Section 365 and that Ernst is a significant anchor tenant in that center.

In addition to the general harm just described, Mr. Brooks outlines in his declaration the specific harm that will be suffered by the Landlord if the requested extension is granted. For 1997, Mr. Brooks estimates that the Landlord will suffer the loss of $5,500 in CAM charges and $6,000 in 1996. For the two month extension, then, the Landlord will lose a little less than $1,000. There is no dispute that all other charges under the Puyallup Lease, including base rent and taxes, have been paid since the commencement of Ernst's bankruptcy. Under the AOS Agreement, AOS has the obligation to continue paying these charges until the Puyallup Lease is assumed or rejected.

## C. The Test for Cause.

The list of factors noted by the court in Victoria Station generally require the Court to balance the debtor's interest in maximizing the value of its leasehold interests and the harm to the landlord that is a consequence of the debtor's action or inaction. After considering those and other factors, the Court concludes that Ernst has shown sufficient cause for the 60–day extension.

In approving the FADCO Transaction, the Court held that it was proper to look at Ernst's leases as a group when determining whether they were primary assets of Ernst. The Court held that Ernst's leases are its primary assets, and most likely, the sole source of any distribution to unsecured creditors. The Court further held that a debtor, like Ernst, whose reorganization prospects have evaporated, should not be precluded from obtaining a needed extension of time under Section 365(d)(4) to realize the value of its leaseholds simply because the factors noted in Victoria Station and other cases are focussed on the formulation of a reorganization plan. Those rulings apply equally to the situation here and are incorporated in this Memorandum Decision.

It is true that the only interest of Ernst in the Puyallup Lease is a reversionary interest

---

**4.** The Pep Boys letter of intent was submitted in camera.

in the event that AOS fails to meet its obligation to pay all carrying costs of the lease on a going forward basis. Ernst has a further interest in that if an assignment to an end-use tenant is ultimately made, the Landlord's rejection claim, which appears to be approximately $190,000, would be eliminated as an unsecured claim. Other than those interests, however, Ernst has received all of the consideration that it will receive from AOS from the Puyallup Lease.

The Landlord, however, has not demonstrated any specific harm, other than the loss of approximately $1,000 in CAM charges, that will result from the requested two month extension. If these are compensable damages, they will be subject to reimbursement under Section 365(b)(1)(B) at the time the lease is assumed. If the Puyallup Lease is ultimately rejected, it is clear that the bonus value of the lease is sufficient to compensate the Landlord for any damages it has suffered as a result of Ernst's bankruptcy proceedings.

In approving the FADCO Transaction, this Court held that Section 365(d)(4) should not be interpreted to give a landlord more rights than it would have under applicable state law in the case of a breach by its tenant outside of bankruptcy. The Puyallup Lease contains a continuous use clause in Paragraph Sixth (p. 17). Although part of that provision relates only to store hours, an overall reading of the provision makes clear that Ernst is required to continuously operate on the premises. The provision reads as follows:

Tenant agrees that commencing on the date [Ernst] opens the leased premises for business, ..., it will from and after such initial opening, continuously and uninterruptedly operate .... and conduct on the leased premises the business which it is permitted to operate under the provisions of this lease, except during such periods as the leased premises may be untenable by reason of fire or other casualty, or other reasons beyond the control of Tenant.

The Court agrees with the Landlord that Ernst's cessation of business because of financial problems and commencement of bankruptcy proceedings does not meet the untenable exception because these are circumstances within Ernst's control.

There is a cure provision, however, that would prevent the Landlord from terminating the Puyallup Lease under state law under the circumstances of this case. That provision reads:

Provided, however, it is agreed that if either party shall make default in the fulfillment of any of the covenants or conditions of this Lease, other than the covenant of Tenant to pay rent, and the same cannot be remedied within the time herein provided by the use of reasonable diligence, then such additional time shall be granted, without penalty or other imposition, as may be reasonably necessary and provided the party in default takes immediate steps on receipt of the notice to remedy the default and has proceeded diligently.

Since the cessation of business by Ernst, it has made diligent efforts to remedy its default of the continuous use clause by using every means within its power, including the assignment to AOS under the AOS Agreement, to find an end-use tenant for the Puyallup space and avoid a claim by the Landlord for breach of the lease. No one disputes that there are significant challenges presented by the configuration of the Puyallup space that will make it difficult to relet. Accordingly, even in the absence of bankruptcy proceedings, and assuming Ernst continued to meet its payment obligations under the Puyallup Lease as it has, the Landlord would likely not be able to immediately terminate the lease. The Court concludes that the time Ernst and AOS have had to remedy Ernst's breach of the continuous use clause has been reasonable, and that the requested 60–day extension is also for a reasonable period.

AOS has shown that it has the makings of a legitimate transaction with OfficeMax, Inc. and Pep Boys. It should be given a reasonable opportunity to realize the benefit of its bargain under the AOS Agreement with respect to the Puyallup Lease. Accordingly, I will grant the extension to permit AOS to pursue an appropriate motion to assume and assign the Puyallup Lease to an appropriate tenant or to effect some other disposition within that period.

### D. *The Good Faith of the Landlord.*

AOS argues that a landlord's failure to cooperate with a debtor by waiving provisions of its lease agreement or by providing financing assistance or other support to a replacement tenant so as to permit the debtor to assign the lease to a new tenant under Section 365, is cause for granting an extension of time under Section 365(d)(4). To adopt this approach, however, would effectively eliminate the protections that have been granted to landlords under Section 365. The Court concludes that a landlord has no duty to affirmatively assist a debtor in the assignment of the lease, except to the extent that its lease agreement requires such assistance. For example, in this case, the Puyallup Lease prevents the Landlord from unreasonably withholding its consent to certain proposed actions by Ernst, such as the making of tenant improvements. This "reasonableness" standard is mandated by the terms of the Puyallup Lease. Therefore, to the extent that a proposed assignment of the Puyallup Lease by AOS seeks to effect some change to the lease terms, the Court will be compelled to determine the reasonableness of the Landlord's resistance.

### CONCLUSION

An order will be entered (i) approving the 60–day extension for assumption or rejection of the Puyallup Lease as requested by Ernst in the Extension Motion, and (ii) denying the Landlords' Motion.