989 F.2d 682
 61 USLW 2613, 28 Collier Bankr.Cas.2d 1010,
24 Bankr.Ct.Dec. 162, Bankr. L. Rep. P 75,198
 In re CHANNEL HOME CENTERS, INC.; Channel Home Centers
Realty Corporation; Channel Acquisition Company, Debtors.
LEGACY, LTD., Appellant
v.
CHANNEL HOME CENTERS, INC.; Channel Home Centers Realty
Corporation; Channel Acquisition Company, Appellees.
 No. 91-6056.
 United States Court of Appeals,
Third Circuit.
 Argued June 26, 1992.
Decided March 30, 1993.
Sur Petition for Rehearing April 27, 1993.
 
 Stephen E. Herrmann (argued), Richards, Layton & Finger, Wilmington, DE, for appellant.
 Dennis J. O'Grady, Craig J. Donaldson (argued), and Kevin G. Smith, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for appellees.
 Before: BECKER, HUTCHINSON, and ALITO, Circuit Judges.OPINION OF THE COURT
 ALITO, Circuit Judge:
 
 
 1
 Legacy, Ltd. ("Legacy"), a landlord of Chapter 11 debtor Channel Home Centers Realty Corporation ("Channel Realty"), appeals from an order of the United States District Court for the District of New Jersey. In that order, the district court affirmed two orders of the bankruptcy court that granted, under 11 U.S.C. § 365(d)(4) (1988), a first and second extension of the time within which the lease with Legacy could be assumed. On appeal, Legacy contends that the second extension was invalid because Section 365(d)(4) precludes a bankruptcy court from granting any extension once 60 days have elapsed after the order for relief and because the second extension was granted after that period had ended. Legacy also contends that there was not sufficient "cause" for the extensions. We affirm the order of the district court.
 
 I.
 
 2
 Channel Home Centers, Inc. ("Channel") is a corporation engaged in the retail sale of home improvement products. Channel Realty is a wholly owned subsidiary of Channel and is engaged in leasing, subleasing, purchasing, and selling real estate interests associated with Channel's retail outlets.
 
 
 3
 Channel Realty holds a long-term lease from Legacy for property in the Wilmington, Delaware area (the "Brandywine property"). At the time the lease was entered, the property was a vacant lot, but the debtors subsequently constructed a shopping center on the property at a cost of approximately two million dollars. The shopping center includes a Channel retail outlet, and Channel also subleases space to other stores.
 
 
 4
 On January 14, 1991, Channel and Channel Realty filed separate petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey.[1] Under 11 U.S.C. § 301 (1988), these petitions constituted orders for relief. The two petitions were consolidated, and both debtors continued to operate as debtors in possession. As of the filing date, Channel and Channel Realty were parties to about 200 leases at 91 locations in 19 states.
 
 
 5
 On February 22, 1991, Channel and Channel Realty moved, pursuant to Section 365(d)(4), for an extension of the period of time within which they had to decide whether to assume or reject their leases. In an effort to show that there was "cause" for the extension within the meaning of Section 365(d)(4), Channel and Channel Realty submitted a certification by their chief executive officer, Joseph Nusim, stating that Channel and Channel Realty were "in the process of analyzing their business operations to determine which leases to assume or reject." Explaining that the debtors planned to scale back operations and concentrate on a " 'core' geographical area," Nusim continued:
 
 
 6
 Although [Channel and Channel Realty's] rehabilitation plan ultimately will require [them] to assume or reject the Leases, [their] flexibility to develop a plan of reorganization would be greatly impaired if [they] were prematurely compelled to make a decision as to the assumption or rejection of the Leases at this time. This is particularly true not only because the Leases constitute a primary asset of [Channel and Channel Realty] necessary for the conduct of Channel's retail business, but also because many of the Leases constitute a valuable real estate asset even if the leased premises are not utilized in Channel's business.
 
 
 7
 [Channel and Channel Realty] require additional time to determine and fix those locations at which Channel will continue or discontinue the conduct of its retail business as well as to assess the potential value of the Leases as surplus real estate.
 
 
 8
 ...
 
 
 9
 No landlord will be prejudiced by granting [Channel and Channel Realty] the requested relief because landlords, with few exceptions, continue to receive regular monthly rental payments under the Leases.
 
 
 10
 App. at 131-132.
 
 
 11
 Legacy filed an objection to the motion, arguing that Channel and Channel Realty should be forced to accept or reject leases in those areas in which they had decided not to continue operations. Legacy also contended that it would be prejudiced by delay because it would lose the opportunity to take advantage of the market rate for the Brandywine property before any further decline in real estate values.
 
 
 12
 A hearing on the motion was held on March 15, 1991, but Legacy failed to attend. On that date--60 days after the Channel and Channel Realty petitions were filed--the bankruptcy judge orally granted an extension until June 17, 1991. A written order to this effect was later entered.
 
 
 13
 On May 31, 1991--well before the end of the period of the first extension--the debtors filed a notice of a second motion for an extension under Section 365(d)(4). In the verified application in support of this motion, the debtors noted that they had "expeditiously rejected more than 60 leases since the Filing Date, after making the determination that the leases lacked economic value to the Debtors' estates." Their application further stated:
 
 
 14
 Although the Debtors' rehabilitation plan ultimately will require the Debtors to assume or reject all leases, the Debtors' flexibility in developing a plan of reorganization would be greatly impaired if the Debtors were prematurely compelled to make a decision as to the assumption or rejection of the Leases at this time.
 
 
 15
 In particular, assumption of long term leases prior to confirmation of a plan would result in the conversion of unsecured damage claims into substantial administrative expense claims to the detriment of unsecured creditors.
 
 
 16
 App. at 225-226.
 
 
 17
 Legacy again filed a written objection. Legacy argued that the plain language of Section 365(d)(4) prohibited any extension once 60 days had passed after the filing of the petition. Legacy also maintained that there was no valid "cause" for the second requested extension because, among other things, the debtors had already determined that the Brandywine lease was for an amount less than its current market value.
 
 
 18
 At the hearing on the motion, the debtors' vice president of real estate, Tom Ercolano, testified that a real estate consulting firm had been retained to analyze all of the debtors' properties and had assigned five or six people to work on the project for four or five months. By the time of the hearing, he testified, 60 leases had been rejected and a few had been assumed, but the review and analysis of all of the leases had not been completed. Ercolano stated that the Brandywine lease had substantial value, but he explained that the debtors did not want to assume it at that time because they were still in the process of developing their business plan.
 
 
 19
 At the close of the hearing, the bankruptcy judge stated that he was giving the debtors "one final extension" until late July, and he added that he was directing that the lease be assumed because it was "certainly a valuable asset" of the estate.
 
 
 20
 Well before this deadline, the debtors filed a motion for assumption of the Brandywine lease, and Legacy objected. After another hearing, the bankruptcy judge entered an order memorializing the second extension and granting the motion to assume the lease. Legacy took an appeal to the district court from the bankruptcy court's orders granting the debtors' two extension requests.
 
 
 21
 The district court affirmed and issued a written opinion. The court held that Section 365(d)(4) permits a bankruptcy court to grant a second extension more than 60 days after the order of relief. Noting the debtors' need for time to analyze all of the leases and to decide upon a package of leases to assume, the court also held that there had been valid cause for the extensions.
 
 
 22
 Legacy then took this appeal.II.
 
 
 23
 A. The primary question presented in this appeal concerns a bankruptcy court's authority to grant a second extension under Section 365(d)(4) more than 60 days after the order of relief. Relying heavily on the statutory language, Legacy contends that Section 365(d)(4) prohibits a bankruptcy court from granting any extension once the 60-day period ends. By contrast, the debtors maintain that this provision permits a bankruptcy court to grant a second extension at that time. This position is supported by the district court's decision in this case and all but one of the relevant published decisions. See In re American Healthcare Management, Inc., 900 F.2d 827 (5th Cir.1990); In re Victoria Station, Inc., 875 F.2d 1380 (9th Cir.1989); In re Advanced Electronics, Inc., 108 B.R. 53 (Bankr.M.D.Pa.1989); Tigr Restaurant, Inc. v. Rouse S.I. Shopping Center, Inc., 79 B.R. 954 (E.D.N.Y.1987). Contra In re Coastal Industries, Inc., 58 B.R. 48 (Bankr.D.N.J.1986).
 
 
 24
 In attempting to answer the question presented in this case, we do not find guidance in many of the sources that are often claimed to shed light on the meaning of statutory language. Although both sides have cited portions of the legislative history, we find nothing in the legislative history that speaks to the question presented here.[2] Nor do we see any significant help in the bankruptcy law as it existed before Section 365(d)(4) was enacted in 1984[3] or in other provisions of the Code.[4]
 
 
 25
 We do, however, find guidance in the evident purpose of Section 365(d)(4), which, as both parties seem to agree, is to prevent trustees from taking too much time in deciding whether to assume unexpired nonresidential leases. This purpose is apparent from the statute itself, which unequivocally provides that a lease must be deemed rejected unless the trustee assumes it before the 60-day period expires or obtains an extension. Moreover, the legislative history, while silent on the authority of a bankruptcy court to grant a second extension, does support the conclusion that Section 365(d)(4) was intended to prevent undue delay.[5] Likewise, the cases construing this provision recognize that this is the provision's purpose. See In re American Healthcare, 900 F.2d at 830; Sea Harvest Corp. v. Riviera Land Co., 868 F.2d 1077, 1079 (9th Cir.1989); In re Moreggia & Sons, Inc., 852 F.2d 1179, 1185 (9th Cir.1988); Tigr Restaurant, 79 B.R. at 956; In re Unit Portions, Inc., 53 B.R. 83, 85 (Bankr.E.D.N.Y.1985).
 
 
 26
 B. We begin our analysis with the statutory language. Section 365(d)(4) provides in pertinent part as follows (emphasis added):
 
 
 27
 ... [I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
 
 
 28
 In construing this provision, the Ninth Circuit has concluded that the phrase "within such 60-day period" modifies the noun "cause" rather than the verb "fixes." In re Southwest Aircraft Services, Inc., 831 F.2d 848, 851 (9th Cir.1987), cert. denied, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988).[6] See also In re Victoria Station, Inc., 875 F.2d at 1383-85. Under this interpretation, the statute would in effect provide that a covered lease would be deemed to be rejected unless the trustee assumed it within the 60-day period or within such additional time as the court fixes for a cause that exists or arises within such 60-day period. Thus, it would seem to follow that even requests for first extensions would not have to be filed or granted during the 60-day period--provided that they were based on a "cause" that existed or arose during that period.[7]
 
 
 29
 We respectfully disagree with this interpretation for two reasons. First and most important, we believe that it is inconsistent with accepted usage. To use the words "cause ... within such 60-day period" to mean "a cause that exists or arises within the 60-day period" is unnatural, unclear, and unnecessary. If Section 365(d)(4) were meant to convey this meaning, we are confident that different terms would have been employed.
 
 
 30
 Second, we are persuaded that this interpretation is not correct because it would not serve the evident purpose of Section 365(d)(4)--to prevent trustees from taking too much time in deciding whether to assume unexpired nonresidential leases. Under this interpretation, as noted, the statute would not impose any restriction on the time for seeking or granting an extension based on a cause that existed or arose during the 60-day period. Thus, the statute would not prohibit a trustee from waiting until long after the 60-day period expired before seeking even an initial extension based on such a cause.[8]
 
 
 31
 Unable to accept this interpretation of the statute's language, we turn to Legacy's alternative interpretation. Legacy argues that the phrase "within such 60-day period" modifies the verb "fixes." Once this is understood, Legacy contends, the statutory language, read literally, means that a nonresidential lease must be deemed rejected unless the trustee either assumes or rejects the lease (1) within 60 days after the date of the order for relief or (2) within any additional period of time that the bankruptcy court fixes during that 60-day period. This interpretation would mean that a bankruptcy court would be free during the 60-day period to grant an extension of any length but that the court could not, once the 60-day period ended, grant any further extension for any reason. In practical terms, this interpretation would bar virtually all second extensions.
 
 
 32
 We agree that a strictly literal parsing of the words of the statute leads to these results, but we do not believe that we are bound to accept such an interpretation in this case. For one thing, we cannot say that the statutory language unambiguously evidences a congressional intent in effect to prohibit second extensions. The statutory language certainly does not prohibit such extensions in so many words; yet it would have been easy for Congress to do so had that been its intent. Thus, the statutory language alone does not rule out the distinct possibility that those responsible for drafting Section 365(d)(4) simply neglected to address the question of second extensions.
 
 
 33
 Moreover, even unambiguous statutory language need not be followed in those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). See also, e.g., Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989); Green v. Bock Laundry Machine Co., 490 U.S. 504, 509-10, 109 S.Ct. 1981, 1984-85, 104 L.Ed.2d 557 (1989); United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). This is one of those rare cases. Indeed, Legacy has not offered and we have been unable to think of any plausible reason why Congress might have wanted to adopt a provision that means what Legacy says that Section 365(d)(4) means.
 
 
 34
 If Congress had wanted to eliminate all possible delay beyond the 60-day period, it could have simply prohibited all extensions,[9] but Congress obviously did not go this far. If Congress had wanted to permit some extensions but did not trust the courts to keep those extensions within reasonable bounds, it could have limited the total permitted length of extensions.[10] Legacy, however, does not argue that Congress chose this course, and we agree that the statutory language cannot be read to impose such a limitation.
 
 
 35
 Legacy maintains that Congress instead chose to combat undue delays by prohibiting bankruptcy courts from granting any second extensions while placing no limit on the length of first extensions. In other words, Legacy argues, Congress wanted to permit a bankruptcy court to grant, say, a single six-month extension but not under any circumstances to grant two three-month extensions or even two one-month extensions. Such a scheme seems a most unlikely one for attempting to prevent undue delay. Indeed, it seems likely to promote delay by encouraging bankruptcy courts to err on the side of longer extensions during the 60-day period since no subsequent extensions would be permitted under any circumstances. In re American Healthcare, 900 F.2d at 830.
 
 
 36
 Legacy's interpretation would also appear to mean that a bankruptcy court, once the 60-day period ended, could not shorten any extension granted before that period expired. So long as the trustee assumed the lease within the period allowed by the extension granted during the 60-day period, (i.e., "within such additional time as the court ..., within such 60-day period, fixe[d]"), the assumption of the lease would appear to be valid. We do not believe that Congress meant to adopt such a strange regime.
 
 
 37
 Instead, we believe that the language of Section 365(d)(4) was framed and adopted without considering the question of second extensions. We believe that Congress meant to require that initial extensions be sought before the 60-day period expired but that Congress did not address and therefore did not mean to prohibit subsequent extensions that are requested and granted before the expiration of a prior extension.[11] See In re Victoria Station, 875 F.2d at 1385 ("Section 365(d)(4) ... simply does not speak to the ability of a debtor to move for a second extension of time subsequent to the first 60-day period but within the extended period of time provided for assumption or rejection.") We thus agree with the result reached by the two other courts of appeals and all but one of the other courts that have considered this question. Accordingly, we hold that Section 365(d)(4) did not bar the bankruptcy court from granting a second extension in this case.
 
 III.
 
 38
 Legacy argues that even if Section 365(d)(4) does not prohibit second extensions after the end of the 60-day period there was no good "cause" for the extensions granted in this case. We disagree.
 
 
 39
 Legacy first contends that the bankruptcy and district courts committed legal error by holding that an extension may be granted because of the time needed by a Chapter 11 debtor to develop a plan of reorganization. Legacy reasons as follows. The Code grants a Chapter 11 debtor the exclusive right to develop a reorganization plan during the first 120 days after the filing of the petition unless that period is shortened or lengthened by the court. 11 U.S.C. § 1121(b), (d) (1988). Section 365(d)(4), by contrast, requires a trustee to assume or reject a lease within 60 days unless an extension is granted. Therefore, Legacy reasons, an extension may not be granted because of a debtor's need for more than 60 days to complete its plan. As Legacy puts it, "[t]he very purpose of § 365(d)(4) was to make debtors decide about assumption or rejection of a lease prior to filing their plan of reorganization." Appellant's Br. at 33.
 
 
 40
 In our view, the final step in this process of reasoning is unsound. Since the time period specified in Section 365(d)(4) (absent an extension) is 60 days and the time period specified in Section 1121 (absent modification by the court) is 120 days, it follows that an extension under Section 365(d)(4) may not properly be granted for the sole purpose of making these two periods coincide and without considering whether the extension is in fact needed in the particular case in question. In re Perfectlike Co., 116 B.R. 84, 88 (Bankr.N.D.Ohio 1990). But nothing prevents a bankruptcy court from granting an extension because a particular debtor needs additional time to determine whether the assumption or rejection of particular leases is called for by the plan of reorganization that it is attempting to develop. Thus we agree with the district court in this case and with In re Wedtech Corp., 72 B.R. 464, 471-72 (Bankr.S.D.N.Y.1987), that it is permissible for a bankruptcy court to consider a particular debtor's need for more time in order to analyze leases in light of the plan it is formulating.
 
 
 41
 Finally, Legacy argues that the bankruptcy court made erroneous factual findings regarding the debtors' need for more time. We have reviewed the pertinent portions of the record, and we find no clear error. We find sufficient factual support for the finding that the debtors needed the extensions in order to make a decision regarding the Brandywine lease as part of their plan.
 
 
 42
 The order of the district court is therefore affirmed.
 
 
 43
 HUTCHINSON, Circuit Judge, dissenting.
 
 
 44
 I respectfully dissent from the Court's order and opinion in this case. I do so because I believe § 365(d)(4) of the Bankruptcy Code unambiguously authorizes the bankruptcy court to grant only a single extension of time for a debtor to decide whether to assume or reject an unexpired lease of nonresidential real property. Even if the statute did permit multiple extensions, I do not believe that cause to justify the bankruptcy court's order granting the debtor a second extension of time is present here. Therefore, I would vacate the order of the district court and remand the case to it with instructions to reverse the order of the bankruptcy court granting the debtors a second extension.
 
 
 45
 A central issue in this case is whether § 365(d)(4) is ambiguous. See Mellon Bank v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980) (term is ambiguous if susceptible to two reasonable alternative interpretations). We have applied the following principles in determining ambiguity:
 
 
 46
 [I]f the statutory language is clear and plain, a court must give it effect unless the legislative history is such that a literal reading "will produce a result demonstrably at odds with the intention of [the] drafters," [Griffin v. Oceanic Contractors, Inc.,] 458 U.S. [564,] 571 [102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) ], or in other words, "would thwart the obvious purposes of the ... [statute]." Mansell v. Mansell, [490 U.S. 581, 592, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675] (1989)....
 
 
 47
 Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 910 (3d Cir.1990) (parallel citations omitted).
 
 
 48
 Section 365(d)(4) states in pertinent part:
 
 
 49
 [I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such sixty-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
 
 
 50
 11 U.S.C.A. § 365(d)(4) (West 1993) (emphasis added). As the Court seems to recognize, the plain meaning of the emphasized language limits the bankruptcy court to granting a single extension of time within the initial sixty-day period during which a debtor would otherwise have to decide whether to assume or reject an unexpired lease of commercial real estate.
 
 
 51
 In re Coastal Industries, Inc., 58 B.R. 48 (Bankr.D.N.J.1986) aptly makes this point. The debtor there, like the debtors in the present case, had filed a second motion to extend. The second motion was filed before the expiration of the time allowed by the first extension, but after the expiration of the initial sixty-day period. The bankruptcy court denied the debtor's second motion because the "language in fixing the time within which the debtor must act is unequivocal" and the court "would truly be gazing with a jaundiced eye were it to perceive some ambiguity within § 365(d)(4)." Id. at 50.
 
 
 52
 This Court now states, to avoid the effect of the text, "[I]f Congress had wanted to eliminate all possible delay beyond the 60-day period, it could have simply prohibited all extensions[.]" Supra at 687-88. There was no need, however, for Congress to restate the principle that a bankruptcy court may grant only one extension under § 365(d)(4). It had already said so. Additional statement would have been redundant.
 
 
 53
 As the Court also recognizes, the legislative history of § 365(d)(4) contains no indication that the statute does not mean what its plain text says. Section 365(d)(4) was enacted in 1984 as part of the Bankruptcy Amendments and Federal Judgeship Act, Pub.L. 98-353, 98 Stat. 333, sec. 362. Before its enactment, Chapter 11 debtors had no fixed deadlines for assuming or rejecting unexpired leases. Thus, as the Court puts it, "Section 365(d)(4) was clearly intended to impose some restrictions on the time within which a trustee must decide whether to assume or reject a covered lease[.]" Supra at 685 n. 3. It is acknowledged that this restrictive purpose appears not only in the unequivocal language of the statute itself, but also in its legislative history. See supra at 686. Thus, the Court quotes comments by Senator Hatch as some indication of general congressional sentiment regarding § 365(d)(4). I repeat them here:
 
 
 54
 The bill would lessen the problems caused by extended vacancies and partial operation of tenant space by requiring that the trustee decide whether to assume or reject nonresidential real property lease within 60 days after the order for relief in a case under any chapter. This time period could be extended by the court for cause, such as in exceptional cases involving large numbers of leases. One of the minor changes in this subtitle was to limit it to nonresidential real property leases. If the lease is not assumed or rejected within this 60-day period, or any additional period granted by the court, the lease is deemed rejected and the trustee must immediately surrender the property to the lessor.
 
 
 55
 Supra at 685 n. 2 (quoting 130 Cong.Rec. S8894-95 (daily ed. June 29, 1984), reprinted in 1984 U.S.Code Cong. & Admin.News 590, 599) (emphasis deleted).
 
 
 56
 I also think the Court's interpretation of § 365(d)(4), to give a debtor an opportunity for multiple extensions of time, hinders accomplishment of the main purpose of the statute. Multiple opportunities for extension allow a debtor to speculate on the market for commercial real estate during the prolonged period of uncertainty about the tenant's election to accept or reject the leasehold. The landlord has no such opportunity. It must simply wait and suffer the uncertainty of the market risk that the debtor avoids while delaying decision. So long as unilateral power to accept or reject a lease remains in the debtor, mutuality of obligation is absent. I think Congress, in enacting § 365(d)(4), wanted to put limits on that unilateral power and to do so said, in effect, to debtors who are lessees of commercial real estate--at the time you seek the protection of a bankruptcy court, decide within sixty days whether you want to continue your commercial leases with both their obligations and their benefits or else persuade the court within that sixty days that you need more time.
 
 
 57
 I realize that there is some force in the Court's observation that a prolonged lack of mutuality is possible even under my interpretation of § 365(d)(4) because that section does not limit the length of the first extension. See supra at 687-88. Despite that observation's initial appeal, I do not think it overcomes the statute's unambiguous text. Moreover, the statute's limiting purpose is still served, at least in part, by allowing only one extension. If that single extension must be granted within sixty days of a petition for reorganization, the landlord knows soon after bankruptcy precisely when his uncertainty will end and the debtor also knows when he must act to affirm or reject. This shared knowledge assists both parties in planning their affairs and it limits the possibility that one party, the tenant, can continue to free itself of market risk as it continues to monitor market conditions at the other party's expense.
 
 
 58
 The Court reasons that interpreting § 365(d)(4) as permitting only one extension within the initial sixty-day period "would also appear to mean that a bankruptcy court, once the sixty-day period ended, could not shorten any extension granted before that period expired." See supra at 687-88 (emphasis in original). The language of the statute, however, unequivocally addresses only the time within which a bankruptcy court may fix additional time for the debtor to act to accept or reject the lease. It does not prohibit the bankruptcy court from shortening an extension properly granted within the first sixty-day period. The reason for the absence of such a prohibition is logically tied to the statute's legislative purpose of preventing undue delay by the debtor in accepting or rejecting a lease. If the circumstances that warranted the extension change, thus rendering the additional time unnecessary, the language of § 365(d)(4) does not prevent the bankruptcy court from entering an order shortening the extension of time that it granted for the debtor to act.
 
 
 59
 Thus, the Court's interpretation of § 365(d)(4), permitting the bankruptcy court to grant multiple extensions of time after the expiration of the initial sixty-day period, seems to me inconsistent with the statute's plain meaning and purpose. It is also unsupported in the legislative history. Accordingly, I do not think it is likely to be right. See Government of the Virgin Islands v. Knight, 989 F.2d 619, 633 (3d Cir.1993) (construction inconsistent with statute's plain meaning is justifiable only when clear indications of contrary legislative intent exist) (citing Consumer Party v. Davis, 778 F.2d 140, 147 (3d Cir.1985)).
 
 
 60
 If we read § 365(d)(4) naturally, to permit only one extension of the sixty-day period in which to assume or reject a lease, we are faithful to both the plain language of the text and its purpose. While absence of mutuality of obligation between the debtor and the lessor would still exist initially, uncertainty is reduced. By the same token, a stand-still agreement compelled by law remains in place to meet the debtor's need for time to sort out its obligations; that stand-still agreement is subject to reasonable extension if extension is needed and promptly sought.
 
 
 61
 Moreover, even if the statute did permit multiple extensions, it still would require cause for all extensions. Here, I do not think there is cause for granting the second extension. I appreciate the complexity of the debtors' reorganization, involving, as it does, more than two hundred leases. That complexity justified the first extension; however, by the time the debtors moved for the second extension, they had already determined that the Brandywine lease had "substantial value" because the rent required was less than the fair value of the lease term. If the debtors ultimately decide to file a reorganization plan that does not include continued operations on the Brandywine premises, they can sublet at a profit. They cannot lose. The bankruptcy court recognized this when it directed the debtors to assume the lease because it was "certainly a valuable asset." Accordingly, these debtors have not met the statutory requirement of showing cause for the second extension.
 
 
 62
 In sum, both the language and legislative history of § 365(d)(4) indicate that a bankruptcy court may grant only a single extension of time within which a debtor must determine whether to accept or reject an unexpired nonresidential lease and that extension must be granted within the initial sixty-day period. Furthermore, even if multiple extensions were permissible, these debtors have no cause which could justify the second extension the bankruptcy court granted them. I would therefore reverse the district court's order affirming the bankruptcy court.SUR PETITION FOR REHEARING
 
 
 63
 April 27, 1993.
 
 
 64
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.
 
 
 65
 The petition for rehearing filed by appellant in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the Court in banc, the petition for rehearing is denied.
 
 
 66
 Judge HUTCHINSON would grant rehearing.
 
 
 
 [1]
 The remaining appellee, Channel Acquisition Company, which owns all of Channel's stock, filed a chapter 11 petition on April 8, 1991
 
 
 [2]
 Section 365(d)(4) was enacted into law as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98-353, 98 Stat. 333, sec. 362. This provision was contained in a number of bills considered in the Senate. S. 2297, 97th Cong., 2d Sess., sec. 2 (1982); S. 445, 98th Cong., 1st Sess., sec. 252(a) (1983); S. 549, 98th Cong., 1st Sess., sec. 2 (1983). While the legislative history for these bills is extensive, the provision which became 365(d)(4) was given no more than a cursory explanation in the Senate reports and floor debate. See S.Rep. No. 70, 98th Cong., 1st Sess. 20-21 (1983) ("Section 365(d) has been amended to provide that ... an unexpired non-residential lease of the debtor is deemed rejected if the trustee does not assume or reject such lease within 60 days, or within such additional time as the court, for cause, orders."); S.Rep. No. 65, 98th Cong., 1st Sess. 68 (1983) (same); 128 Cong. Rec. S13229 (daily ed. Oct. 1, 1982) (statement of Sen. DeConcini) ("This amendment would require the trustee to decide whether to assume or reject a lease in 60 days.... This time could be extended for cause in a complicated case.")
 The statement of Senator Hatch, a member of the Senate Judiciary Committee and a Senate Conferee, typified congressional commentary on the provision (emphasis added):
 The bill would lessen the problems caused by extended vacancies and partial operation of tenant space by requiring that the trustee decide whether to assume or reject nonresidential real property lease [sic] within 60 days after the order for relief in a case under any chapter. This time period could be extended by the court for cause, such as in exceptional cases involving large numbers of leases. One of the minor changes in this subtitle was to limit it to nonresidential real property leases. If the lease is not assumed or rejected within this 60-day period, or any additional period granted by the court, the lease is deemed rejected and the trustee must immediately surrender the property to the lessor.
 
 
 [130]
 Cong.Rec. S8894-95 (daily ed. June 29, 1984), reprinted in 1984 U.S.Code Cong. & Admin.News pp. 590, 599
 Pointing to the phrase "any additional period granted by the court," Legacy contends that Senator Hatch's use of the singular term "period" rather than the plural "periods" indicates that Senator Hatch understood that only one extension could be granted. We disagree. First, the length of time covered by two or more extensions could be referred to as a "period." Second, we refuse to attribute so much significance to a single word uttered by a single member of Congress, even one in a position of particular authority with respect to the legislation in question.
 Relying on the same phrase "any additional period granted by the court," the debtors argue that Senator Hatch's use of the word "any" suggests that "the courts have great discretion in granting extensions of time." Appellees' Br. at 28. We find this reliance on a single word no more convincing than Legacy's.
 
 
 [3]
 Before Section 365(d)(4) was enacted in 1984, Chapter 11 debtors had no fixed deadlines for assuming or rejecting unexpired leases, although the court could specify such a deadline. 11 U.S.C. 365(d)(2) (1982). Section 365(d)(4) was clearly intended to impose some restrictions on the time within which a trustee must decide whether to assume or reject a covered lease, but nothing in pre-Code law can tell us what restrictions Congress intended to impose
 
 
 [4]
 Legacy observes that Section 365(d)(1), which applies to cases under chapter 7, contains the same relevant language as Section 365(d)(4) and that former Bankruptcy Rule 607, 11 U.S.C. app. (1982), contained similar language. Legacy, however, has not brought to our attention authority establishing that either of these provisions prohibited a second extension after the end of the initial 60-day period. Cf. In re Telemark Management Co., 51 B.R. 623 (Bankr.W.D.Wisc.1984) (multiple extensions permitted under Section 365(d)(1)). Thus, these other provisions do not shed light on the question before us
 
 
 [5]
 See the statement of Senator Hatch quoted in footnote 2, supra
 
 
 [6]
 Unlike the case before us, In re Southwest Aircraft presented the question whether, after the end of the 60-day period, a bankruptcy court could grant an initial extension that had been requested before the period ended. The Ninth Circuit held that the statute permitted the bankruptcy court to grant the extension
 In In re Victoria Station, the Ninth Circuit confronted the question presented in this case. Relying on its decision in In re Southwest Aircraft, it held that Section 365(d)(4) does not preclude a second extension that is sought and granted after the 60-day period expired but before a prior extension ended. In re Victoria Station, 875 F.2d at 1383-85.
 
 
 [7]
 While we believe that a necessary consequence of the Ninth Circuit's parsing of the statutory language is that a first extension request would not have to be filed within the 60-day period, the Ninth Circuit's decisions do not expressly embrace this conclusion. As previously noted (footnote 6, supra) In re Southwest Aircraft approved a first extension that was requested during the 60-day period but granted after the period expired. In re Victoria Station approved a second extension that was sought and granted during the period covered by a first extension
 
 
 [8]
 In Tigr Restaurant, 79 B.R. at 955, the district court offered the following, different interpretation of the statute (emphasis in original):
 Section 365(d)(4) empowers the court to grant extensions of time during "such" 60-day period. "Such" could be read as referring only to the "60 days after the date of the order for relief." However, the court is also empowered to grant "such additional time" as it sees fit. In a case where the Court has actually granted "such additional time," "such 60-day period" could refer to sixty-day periods within the "such additional time."
 We find this interpretation even more strained than the Ninth Circuit's.
 
 
 [9]
 An example of such a provision, albeit one promulgated by the Supreme Court rather than enacted by Congress, is Fed.R.Civ.P. 59(e)
 
 
 [10]
 Familiar examples are Fed.R.App.P. 4(a)(5), (6)
 
 
 [11]
 Because both the extensions in this case were requested and granted before the relevant period expired, we need not and do not decide whether under Section 365(d)(4) a timely request may be granted after the period expires. See In re American Healthcare, 900 F.2d at 830 n. 2 (citing conflicting cases)