**In re SERVICE MERCHANDISE COMPANY, INC., et al.,
Debtor.**

No. 399–02649.

United States Bankruptcy Court,
M.D. Tennessee.

Feb. 2, 2000.

See also 256 B.R. 738, 256 B.R. 755.

745

John William Butler, Jr., George N. Panagakis, Skadden, Arps, Slate Meagher & Flom, Chicago, IL, Paul G. Jennings, Beth A. Dunning, Bass, Berry & Sims PLC, Nashville, TN, for debtors.

Ellen B. Vergos, United States Trustee, Region 8, Memphis, TN, Beth Roberts Derrick, Assistant United States Trustee, Nashville, TN, for Office of the United States Trustee.

Glen B. Rose, Barbara Holmes, Harwell Howard Hyne Gabbert & Manner, P.C.,

Nashville, TN, Glen B. Rice, Otterbourg, Steindler, Houston & Rosen, New York City, for Official Unsecured Creditors' Committee.

David L. Pollack, Jeffrey Meyers, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, Randal S. Mashburn, Baker Donelson Bearman & Caldwell, Nashville, TN, for New Plan Excel Realty Trust, Inc. and General Growth Management, Inc.

Ernest B. Williams, IV, David Canas, Williams & Prochaska, P.C., Nashville, TN, for Castleton Shopping Center, Ltd.

John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, Lauren M. Iscoff, Kozyak Tropin & Throckmorton, P.A., Miami, FL, for Pompano Plaza, Ltd.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, James Carr, Lisa Thompson, Kelley Drye & Warren, LLP, New York City, for Westmoreland Mall Associates & Swansea Mall, LLC.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, James F. Wallack, Christine D. Lynch, Goulston & Starrs, P.C., Boston, MA, for E & A Northeast L.P.

Robert C. Goodrich, Farris Warfield & Kanday, PLC, Nashville, TN, for Heritage Realty Management, Inc.

Patrick M. Thomas, King & Ballow, Nashville, TN, Edwin G. Rice, Glenn Rassmussen Fogarty & Hocker, P.A., Tampa FL, for Argyle Village Square Shopping Center, L.P.

Randal S. Mashburn, John H. Rowland, Baker Donelson Bearman & Caldwell, Nashville, TN, for Bennett Management Corporation, Newstart Factors, Inc., Bennett Restructuring Fund, L.P., and Bennett Offshore Restructuring Fund, L.P.

David Kleinfelter, Nashville, TN, Thomas M. Mayer, Phillip Bentley, Amy Caton, Kramer Levin Naftalis & Frankel, LLP, New York City, for Contrarian Capital Management LLC, Touchstone Capital, LLC, and Varde Partners.

## MEMORANDUM & ORDER

GEORGE C. PAINE, II, Chief Judge.

This matter is before the court on the debtors' motions to extend the time for assumption or rejection of certain go-forward store, nonresidential leases pursuant to section 365(d)(4) and to extend the exclusivity periods for filing a plan of reorganization and soliciting acceptances to that plan. The court held a two-day evidentiary hearing on these matters and took the issues under advisement. The following constitutes this court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

Service Merchandise and 31 of its affiliates (hereinafter "debtors") filed a voluntary chapter 11 on March 27, 1999. The debtors are among America's leading retailers of jewelry, gift and home decor products. For the fiscal year ending January 3, 1999, the debtors had consolidated net revenues of approximately $3.2 billion and administered approximately $1.5 billion of assets at book value. The debtors declared publicly upon filing that they intended to reorganize and emerge successfully from chapter 11 in the spring of 2001.

From the outset of this case, the debtors telegraphed their management time line for their reorganization strategy. According to their public plans, the debtors intended to utilize 1999 to stabilize the business. At the point that stabilization occurred, and after review of critical 1999 Christmas sales figures, the debtors contemplated that they would set forth a "go-forward" strategy for business year 2000. After review of their go-forward strategy by crunching the Christmas season 2000 numbers, the debtors would file a disclosure statement and plan for their exit from chapter 11 in the spring of 2001. This strategy was, or should not have been, a surprise to any interested party. It is has been the debtors' course of action since the very inception of this case.

Given the familiarity of all interested parties in these issues, further factual background is unnecessary. The matters before the court are legal issues involving few factual disputes that are relevant to the resolution of the issues. The court will first discuss the section 365(d)(4) extension and then the exclusivity extension requests.

## A. The Leases

The debtors originally sought an extension through confirmation to assume or reject these go-forward store leases. The court granted the extension until March 31, 2000 without prejudice to the right of the debtors to seek a further extension and without prejudice to the landlords' right to seek a shortening of the period.

■ The debtors now seek a second extension through confirmation.[1] Numerous objections were filed to the debtors' request. Most objections were resolved by agreement, but a contested hearing was held as to the 11 stores that did not reach some settlement with the debtor.[2] Specifically the objecting landlords argued that they would be prejudiced by the continued state of uncertainty by the debtors' indecision. Prejudice could result from any one of several scenarios: (1) the debtor could reject the lease just prior to the Christmas season leaving the space dark through the holiday season; (2) the debtors' rejection, where it serves as an anchor tenant, could disrupt the tenant mix so as to cause decreased business traffic; (3) the debtors' indecision could make it difficult for the landlord to interest tenants in committing to leases or renewing leases for fear of losing Service Merchandise as an anchor tenant; (4) without a final decision from the debtors, the landlords may have difficulty in obtaining financing for, or interest a buyer in, the shopping center; (5) the debtors might close a store leaving it dark during holiday peak season; or (6) the debtors might stop meeting post-petition obligations. In addition, almost every objection raised the issue of whether the debtor could be granted such an "open-ended" extension under the express language of section 365.

■ Section 365(d) provides:

(d) (1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such contract or lease is deemed rejected.

(2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

(3) The trustee shall timely perform all the obligations of the debtor, except

---

1. At least one of the objectors argued that the law prohibits a second extension. The court has reviewed this issue and finds, as at least two other Courts of Appeal have found, that a second extension is permissible. *See In re Channel Home Centers, Inc.,* 989 F.2d 682 (1993); *In re American Healthcare Management,* 900 F.2d 827 (5th Cir.1990) (3 extensions). The first extension request was timely under section 365(d)(4).

2. The objecting landlords were Castleton Shopping Center, Ltd. (Store Number 106); Pompano Plaza, Ltd. (Store Number 110); Swansea Mall, LLC, and Westmoreland Mall Associates (Store Numbers 188 and 786); E & A Northeast Limited Partnership (Store Number 81); Heritage Realty Management, Inc. (Store Number 271); Argyle Village Shopping Center Limited Partnership (Store Number 172); and New Excel Realty Trust and General Growth Management, Inc. (Store Numbers 166, 168, 482 and 463). There are 11 stores at issue.

those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

(4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d) (2000). An extension under section 364(d)(4) may only be granted for "cause." Cause is an undefined term in the Code, and has been left to judicial interpretation. Courts generally look to the following factors for guidance:

(1) whether the lease is the primary asset of the debtor;

(2) whether the lessor has a reversionary interest in the building built by the debtor on the landlord's land;

(3) whether the debtor has had time to intelligently appraise its financial situation and the potential value of its assets in terms of the formulation of a plan;

(4) whether the lessor continues to receive the rent required in the lease;

(5) whether the lessor will be damaged beyond the compensation available under the Code due to the debtor's continued occupation;

(6) whether the case is exceptionally complex and involves a large number of leases;

(7) whether the need exists for a judicial determination of whether the lease is disguised as a security interest;

(8) whether the debtor has failed or is unable to formulate a plan when it has had more than enough time to do so; and

(9) any other factors bearing on whether the debtor has had a reasonable amount of time in which to decide whether to assume or reject the lease.

*See, e.g., In re Victoria Station, Inc.,* 88 B.R. 231 (9th Cir. BAP 1988), *aff'd,* 875 F.2d 1380 (9th Cir.1989); *In re Wedtech Corp.,* 72 B.R. 464, 471–73 (Bankr.S.D.N.Y. 1987); *In re Columbus One Parcel Serv., Inc.,* 138 B.R. 194 (Bankr.S.D.Ohio, 1992). This list is not exclusive, and a great deal of discretion is left to the court to weigh all relevant factors related to the requested extension. *In re Ernst Home Center, Inc.,* 221 B.R. 243 (9th Cir. BAP 1998).

 The debtors assert that they need additional time to intelligently decide whether assumption or rejection is in the best interest of the estate. The court finds that the debtors have demonstrated that need. This decision is based upon the factors as listed above and the credibility of Mr. Sam Cusano's testimony concerning the debtor's progress in the case to date.

The court found extremely credible Mr. Cusano's testimony that if this extension were not granted the debtors may be compelled, prematurely, to assume substantial long-term liabilities or forfeit the benefits associated with these leases to the detriment of the reorganization effort. Mr. Cusano testified at great length concerning the debtors' preliminary assessment of its Christmas performance. These numbers were essentially unrebutted. The

proof established that the debtors met and exceeded the 1999 Business Plan goals, and achieved the overall objective of stabilization of the business. At this point, the debtors seek to set forth their "go-forward" strategy, as made public by their 2000 Business Plan, and "test the waters" with that strategy within the confines of chapter 11.

Forcing the debtors to act by March 31, 2000 to assume or reject these valuable estate assets could be of extreme detriment to this estate. The debtors have just now, in accordance with the time line established at the beginning of the case, reached stabilization. The court agrees with the debtors that compelling a decision now on assumption or rejection would inhibit this debtors' progress within chapter 11. The debtors' decision to assume or reject a particular lease depends in large part whether that particular store will pay a role in the future of the debtors' strategic plan going forward. The debtors have been forthcoming and have thus far proceeded in good faith in reaching an informed decision on the fate of these leases. The court finds that more time is needed.

The court did consider the potential prejudices to the landlords. Intertwined within this inquiry is whether the debtors have been timely complying with all post-petition obligations. Through Mr. Cusano, the debtor established that it has and will continue to timely meet all post-petition obligations on all of these leases. This proof was unrebutted. The debtors recognize the potential for inconvenience to the landlords in having to wait for a decision on assumption or rejection, but argue that this is no different from the inconvenience suffered by every landlord with a chapter 11 tenant.

This is a large and complex case. The court agrees with the debtors that the resulting prejudice to the landlords does not outweigh the debtors' need for additional time. The process of assumption or rejection simply takes a little longer in a case this size with the amount of money at issue and the number of leases to assess. The landlords remain amply protected during this extension by the continued payment of rent and all other post-petition obligations, and their right, at any time, to seek a shortening of the period for cause.

Finally, the court considered that "cause" was demonstrated at the first hearing on extension within the original time frame of section 365(d)(4). All those same factors that were in play during the first extension request remain so in this hearing. These leases are absolutely essential assets of the estate, and requiring the debtors to make a decision on assumption or rejection before a clear chapter 11 exit strategy is fully developed would not be in the best interest of the estate.

■ Notwithstanding the uncertainty and inconvenience associated with this extension, the court finds that the debtors have demonstrated cause for a second extension. The court agrees, however, with the objecting landlords that an open-ended extension is inconsistent with the spirit and intent of the Code. Because the court finds that the debtor will need time to assess its Christmas 2000 performance, the court finds that the time for assuming or rejecting these objecting go-forward stores will be March 31, 2001. This will provide the landlords with a date certain, and will provide the debtors with enough time to make intelligent decisions on what leases should be assumed, and what leases should be rejected on a go-forward basis. This extension is without prejudice to the debtors' right to seek further extensions and without prejudice to any landlord's right to seek a shortening of the time for assumption or rejection.

**B. Exclusivity Extensions**

The debtors first requested that exclusivity be extended in May of 1999. This motion was largely unopposed, and the court granted the debtors' the exclusive right to file a plan until February 29, 2000. The debtors argue that it was implicit that

another extension would be sought by the debtors' continued reiteration of its strategic time line to emerge from chapter 11 in the spring of 2001. Consistent with this goal, the debtors filed this second motion to extend the exclusivity periods to file and solicit acceptances to a plan until April 30, 2001 and June 30, 2001 respectively.

The motion seeks an order from the court that accomplishes several things. First, the order would extend the exclusivity periods until the requested dates. Secondly, the order would establish April 3, 1999 as a bar date for the Unsecured Creditor's Committee to file an objection to be heard at the May 2, 2000 scheduled Omnibus Hearing. The debtors' motion seeks to allow this issue, as to the Committee only, to be continued until the May 2, 2000 Omnibus Hearing, assuming an objection is timely filed, to allow the Committee to assess the debtors' 2000 Business Plan scheduled to be released in mid-March.

Three objections were filed. The Bank of New York as trustee for the holders of 9% Senior Subordinated Debentures issued in 1993 in the original principal amount of $300,000,000, objected to not having the same extension that the debtor's motion proposes to give to the Committee. The Bank of New York would like the equivalent opportunity to review the 2000 Business Plan and file an objection by April 3 to be heard at the May 2, 2000 Omnibus Hearing if review of the plan leads the Bank of New York to object to the 14-month extension sought by the debtor. Bennett Management Corporation filed a similar objection.[3]

The third objection was filed by Contrarian Capital Management, LLC, Touchstone Capital and Varde Partners (collectively "Contrarian"). These entities represent noteholders holding $65,000,000 of 9% of Senior Subordinated Notes and $18,000,000 in trade claims. Contrarian takes the position that while the debtor has earned a short extension of the exclusivity periods, a 14-month extension is far in excess of what is reasonable. Contrarian challenged the debtors' financial wherewithal to continue as a going concern without significant depreciation of the estate thereby reducing the return to unsecured creditors in the event of a liquidation. Contrarian requested at the very least, to receive the same treatment the debtor affords the Committee.

■ Section 1121 provides:

(a) The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case or an involuntary case.

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—

(1) a trustee has been appointed under this chapter;

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of

---

**3.** The actual objecting parties were Bennett Management Corporation, Newstart Factors, Inc., Bennett Restructuring Fund, L.P., and Bennett Offshore Restructuring Fund. All are related entities and for convenience will be referred to as "Bennett." Because Mr. Michael C. Eisenbrand was unable to attend the hearing, the debtors offered his 2004 deposition testimony relative to Bennett's objection. Contrarian Capital Management objected to introduction of the deposition arguing that it was hearsay. Although neither the debtors nor Contrarian articulated the basis for the objection and the response thereto particularly clearly, the court will sustain the objection and exclude the deposition. Furthermore, because Bennett was not there to prosecute its particular objections, the court will overrule their objections to the exclusivity period extensions.

claims or interests that is impaired under the plan.

(d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section.

11 U.S.C. § 1121(d) (2000). On request of a party, the court may extend the deadlines "for cause" after a notice and a hearing. It is the debtors' burden to demonstrate "cause" exists. *In re All Seasons Industries, Inc.*, 121 B.R. 1002 (Bankr. N.D.Ind.1990).

Several decisions have endeavored to interpret cause when granting extensions. *In re United Press International Inc.*, 60 B.R. 265, 269 (Bankr.D.D.C. 1986) (debtor had shown diligence in moving quickly in a complex case with multiple adversary proceedings and court granted extension to file a plan); *In re Swatara Coal Co.*, 49 B.R. 898 (Bankr.E.D.Pa.1985) (court granted extension for time to gain acceptances where debtor showed a reasonable likelihood of a successful reorganization); *In re Pine Run Trust Inc.*, 67 B.R. 432 (Bankr.E.D.Pa.1986) (extensions should not be granted routinely but only where the debtor shows a probability of successful reorganization); *but see In re Gagel & Gagel*, 24 B.R. 674 (Bankr. S.D.Ohio 1982) (inappropriate to grant extension for time to gain acceptances when such extension would be fruitless). An extension should not be granted that would impair a competing plan, but rather courts should focus on the unusual circumstances affecting the Debtor's ability to effectuate a Plan, not competitive factors created by the Code.

Factors which courts have considered in determining whether cause exists include:

1. the size and complexity of the case,

2. the necessity of sufficient time to negotiate and prepare adequate information,

3. the existence of good faith progress toward reorganization,

4. whether the debtor is paying its debts as they come due,

5. whether the debtor has demonstrated reasonable prospects for filing a viable plan,

6. whether the debtor has made progress negotiating with creditors,

7. the length of time the case has been pending,

8. whether the debtor is seeking an extension to pressure creditors, and

9. whether unresolved contingencies exist.

*See In re Crescent Manufacturing*, 122 B.R. 979, 982 (Bankr.N.D.Ohio 1990); *In re McLean Indus. Inc.*, 87 B.R. 830, 834 (Bankr.S.D.N.Y.1987).

The court finds that cause does exist for the extension based on (1) the size and complexity of the case; (2) the need to extend exclusivity through the 2000 Christmas season and good vendor relations; (3) a focused strategy demonstrating reasonable prospects for filing a viable plan or reorganization; (4) the debtor's progress in the case to date; (5) the fact that the extension is not sought to pressure creditors; and (6) extension of exclusivity is in the best interest of the estate.

### 1. Size and Complexity of the Case

This a retailer with more than 210 continuing stores located in 34 states, with distribution centers located in Tennessee, Florida, New York and Kentucky. As of March 1, 1999, the debtors employed more approximately 8,970 full time employees and 13,308 part-time employees, These debtors generated approximately $3.2 billion in net revenues for the fiscal year ending January 3, 1999. Asset disposition since the beginning of the case has generated approximately $100 million in net

cash proceeds. Some 50 leases have already been rejected, and the debtor sold their interest in approximately 76 locations. There is absolutely no question that this is a large and complex case requiring tremendous coordination to administer. It is not unreasonable for a retailer of this size to request an extension to make intelligent, informed decisions with respect to the direction and future of the business.

### 2. Need To Extend Through Christmas 2000 & Vendor Relations

The proof was unrebutted that the debtors' business is highly seasonal. November and December sales can account for up to 50% of the debtors' annual business. In order to give the debtor some sense of the direction of this chapter 11, the debtors must be provided some certainty that they will continue to operate through the 2000 Christmas season. As testified to by Mr. Cusano, the debtors must begin annual holiday inventory build-up in the late spring of each year. This build-up will require extensive planning, coordination with vendors, and precise execution. Mr. Cusano's testimony indicated that this can only be done by the debtors full devotion to running the business. If exclusivity is left undecided as late as May, the preparations for the Christmas 2000 season will be affected.

Extension of exclusivity through the Christmas season is not an unreasonable request for a retail case of this size and involving a multitude of complex issues. The debtor utilized 1999 to stabilize its business, and has indicated that 2000 will be the "test" for how to emerge from chapter 11 in 2001. Given the highly seasonal nature of this business, it is entirely reasonable for the debtor to remain under the protections of chapter 11, with an exclusive right to file a plan and solicit acceptances to such, through another Christmas season. Assessing the success of the 2000 Christmas season is critical to the debtors' overall goal of a successful emergence from chapter 11.

Almost inextricable from this analysis is the debtors' dependence upon good vendor relations. The debtors' Christmas inventory preparations depend in large part on vendor confidence in the viability of the debtors. Mr. Cusano testified that the debtors are enjoying terms with 60% of hardline vendors and 100% with jewelry vendors. This enhances liquidity which in turn bolsters confidence in the debtors' success. If exclusivity were not expanded or expanded only until May, vendor confidence may wane. According to Mr. Cusano, in his view, extension of exclusivity through the 2000 Christmas season will result in tangible benefits including continued expansion of trade terms, decreased borrowings under the debtor in possession facility, and steady inventory flow all of which translate into financially, healthier estates. The court cannot disagree.

### 3. Reasonable Prospects for Filing a Viable Plan (A Focused Plan)

It must come as no surprise that the debtors are seeking this exclusivity extension through the 2000 Christmas season. At the April 8, 1999 Meeting of Creditors the debtors introduced their management team and outlined the debtors' strategic initiatives for its eventual reorganization. The debtors time line included delivery of its 1999 business plan by July, 1999 and an initial extension of exclusivity through the first quarter of 2000. The debtors explained that a further extension of exclusivity would be sought following a successful 1999 Christmas season through the early part of 2001. The goal of the 1999 Business Plan, which was formally presented on July 15, 1999 was to treat 1999 as a stabilization year. The 1999 Business Plan included another reminder of its strategic time line.[4]

---

4. The 1999 Business Plan provided as follows: [O]nce we have completed a successful 1999 holiday season, [the Debtors] expect to get [their exclusivity] dates extended to 2001 and to exit Chapter 11 consistent with

The 1999 Business Plan laid out the debtors' intended course of action throughout this chapter 11. By providing certainty to vendors, other creditors, customers and all interested parties, the debtors alleviated much of the uncertainty of chapter 11. The debtors' focused plan and adherence to that plan so far in the case, has demonstrated to the court that the debtors have reasonable prospects for filing a viable plan.

### 4. Progress in the Case to Date

This consideration really is at the heart of Contrarian's objection. The debtors' 1999 Business Plan established certain benchmarks for stabilization of the business. Through Mr. Cusano, the debtors presented their preliminary figures on the success of the 1999 Christmas season. The most critical measure according to the debtors and generally by Contrarian is EBITDAR (earnings before interest taxes depreciation amortization and restructuring charges). According to Mr. Cusano, the debtors met and exceeded every benchmark established in the 1999 Business Plan. EBITDAR was projected at $35,000,000 net of incentives and the debtors finished December approximately $10,000,000 ahead of target.

Contrarian principal, Janice Stanton challenged the debtor's preliminary findings of a successful 1999 arguing that continuing in chapter 11 will reduce the return to unsecured creditors if the case is liquidated some time in the future. Specifically she challenged the accuracy of the debtors' EBITDAR arguing that it failed to take into account certain professional fees and non-reoccurring costs. Further,

the debtors "targets" anticipate huge cash losses. According to Contrarian, the debtors are hemorrhaging cash, and if allowed to continue in chapter 11 will reduce the return to unsecured creditors.

According to Ms. Stanton, even if EBITDAR was $10,000,000 above target, the debtors, by definition, must still pay interest, taxes and restructuring costs as cash items. Interest on the post-petition creditor agreement, the debtors' capital leases, and adequate protection agreements will easily exceed the $40,000,000 mark. The DIP facility allows the debtor to spend $50,000,000 in capital expenditures in 1999 and the debtors' public filings indicate more than $10,000,000 in capital expenditures since the commencement of the case. This $10,000,000 is yet another cash expense that must be paid out of EBITDAR.

Finally, restructuring costs, which Contrarian estimated to approach $35,000,000 must also be paid of EBITDAR. All told, this would result in $85,000,000 in cash payments with EBITDAR of only $45,000,000. According to Contrarian, this means cash losses of at least $40,000,000 during the first nine months of bankruptcy.

David Resnick, an investment banker with Peter J. Solomon Company, Ltd., disagreed with Contrarian's view of the financial figures. Mr. Resnick was a highly persuasive and credible witness.[5] He carefully explained the crucial numbers from which preliminary results could be ascertained. The following is a reproduction of the chart Mr. Resnick used to supplement his testimony:

the original timetable given to our creditors.

5. This not to say that Ms. Stanton was not credible. She was extremely knowledgeable, but the probative value of her testimony was lessened by her business of speculative investing in stressed and distressed companies with a motive of maximizing returns through an early liquidation, and her somewhat compromised position as co-chair on the Unsecured

Creditors Committee and advocate of an ad hoc Bond Committee advocating liquidation of this business. When wearing one hat, she is privy to non-public information, but when wearing the other hat, she is not. The court found no wrongdoing and is not implying any wrongdoing on her part. However, the court found Mr. Resnick's testimony to be more credible on these issues.

| | |
|---|---|
| EBITDAR | $49.6 |
| Interest | <39.7> |
| Cap Exp | <20.7> |
| (Operating Cash Flow) | <10.8> |
| Extraordinary | |
| Prof. Fees | <15.4> |
| Retention | <9.6> |
| (Reorganization Cash Flow) | <35.8> |
| Non-reoccurring | |
| Non cont. EBITDAR | <33.3> |
| Cash Rest. Chgs | <3.6> |
| Gain on Assets | |
| (Total Cash Flow) | <$50.2> |

In Mr. Resnick's opinion the most crucial figure for assessing the financial health of the debtors is the operating cash flow. This amount represents the EBITDAR minus the capital expenditures and the interest. The debtors' operating cash flow was predicted in the 1999 Business Plan to be about negative $30,000,000, but preliminary numbers indicate the cash flow losses to be about $10,800,000. The debtors total cash flow losses were expected to be around $125,000,000 but based on Mr. Resnick's review of the numbers are closer to $50,000,000. According to Mr. Resnick's helpful and credible testimony, the debtors have demonstrated good progress toward being able to propose a viable reorganization plan.

Contrarian's objection focuses on the total cash flow deficiency. The testimony of Mr. Resnick, Ms. Stanton, and Mr. Cusano all indicated that it was not unusual for a retailer of this size to experience cash flow losses in chapter 11. The debtors' total cash flow losses were better than anticipated under the Business Plan presented to the Committee and all interested parties. The court is convinced by the credible testimony of Mr. Cusano and Mr. Resnick that the debtor has made respectable progress in the case to warrant a further extension of exclusivity.

## 5. Extension Not Sought to Pressure Creditors

The court is convinced that the request for extension of exclusivity is not sought for an improper purpose. Instead, the extension request is another procedural step to achieve the debtors' overall time line for successful emergence from chapter 11. There has been no suggestion from any objector or the Committee that this extension is sought for any other reason but to try and successfully reorganize.

## 6. Best Interest of the Estate

The court is of the opinion that extension of the exclusivity periods at this point will facilitate the debtors' reorganization efforts and is in the best interest of all creditors. The debtors have shown the need to propose and evaluate a long range business plan, and given the highly seasonal nature of the business, this can only be done by including Christmas 2000 within the exclusivity extensions. By extending exclusivity through the holidays, both vendors and consumers will be reassured that the debtors' business will be as close to normal as possible. Liquidity should not be threatened by a loss of vendor confidence and the debtors may focus all efforts on establishing and testing their long range plan for emergence from chapter 11. The debtors have remained current on all post-petition obligations and continue to show progress within the case.

A subsequent exclusivity hearing in May with participation of these objectors, and possibly the Unsecured Creditors Committee, would cause the return of countless attorneys, at least one, and probably more, investment bankers, and potentially, other professional witnesses. The expense of this hearing would be duplicated and possibly even exceeded. Given all of the grounds justifying cause for these extensions at this point, the court finds that another hearing in May would not be in the best interest of the estates, and would be unnecessary administrative expenses.

Although there are some creditors favoring a liquidation of this estate to bring a faster return on investments, the court does not find that these objections merit denying the debtors' extension requests. More specifically, the debtors have successfully demonstrated "cause" for the extensions, and none of the objections raised

by the creditors have persuaded this court otherwise.

For all of the reasons cited above, the court will grant the debtors' request for extension of the exclusivity periods. This extension will provide the debtors with an exclusive right to file a plan through and including April 30, 2001. The debtors will have through and including June 30, 2001 to solicit acceptances to that plan. This Order is without prejudice to the rights of the debtors to seek an additional extension and is without prejudice to any party to seek a reduction in the exclusivity periods for cause.[6]

It is, THEREFORE, so ordered.

See also 256 B.R. 738, 256 B.R. 744.

**6.** The debtors motion proposed to extend the time for objections as to exclusivity as to the *Official Committee of Unsecured Creditors* until April 3, 2000 with objections being heard at the May 2, 2000 Omnibus Hearing. The debtor agreed to continue to bear the burden of demonstrating "cause" at that hearing should the Committee raise an objection. In light of the objections by the Bank of New York, Bennett, and Contrarian requesting similar treatment, the court will deny the request for continuance of this hearing as to the Committee only. The Order extending exclusivity is without prejudice to any party, including the Committee, to seek a reduction in the event that the Committee's review of the 2000 Business Plan leads to an objection. Accordingly, any further hearings on exclusivity will be had only in the context of a motion to shorten or lengthen the periods now set to expire April 30, 2001 and June 30, 2001 respectively.